## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS DIETZ, SARAH DIETZ, and M.D., | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:24-cv-02865-TLP-tmp |
| v. | ) ) | JURY DEMAND |
| GERMANTOWN MUNICIPAL SCHOOL DISTRICT, | ) ) ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

In November 2024, Plaintiffs Douglas Dietz, Sarah Dietz, and M.D. sued Defendant Germantown Municipal School District ("Germantown") alleging violations of the Rehabilitation Act of 1973 ("Section 504") and Title II of the Americans with Disabilities Act ("ADA"). (ECF No. 1.) Plaintiffs also moved for a preliminary injunction and permanent injunction. (ECF No. 2.) Germantown answered the Complaint and opposed the entry of an injunction. (ECF Nos. 19, 20.) For the reasons below, the Court **DENIES** Plaintiffs' Motion **WITHOUT PREJUDICE**.[1]

---

[1] On February 12, 2025, the Court summarized this decision on the record so that the Parties would know the Court's ruling. (*See* ECF Nos. 33, 39.) To be clear, this written opinion is the Court's official Order on Plaintiffs' Motion for a Preliminary Injunction and Permanent Injunction (ECF No. 2).

## BACKGROUND

The Court held a preliminary injunction hearing that spanned five days. This case is about a nine-year-old boy, M.D., and his service dog, Herbie. Eight witnesses testified. The Court will first introduce each of the witnesses who testified. And then the Court will summarize the testimony and exhibits received in this case.[2]

### I.    Witnesses

Plaintiffs called Ms. Sarah Holbert ("Ms. Holbert") as their first witness. Ms. Holbert testified remotely. She is the CEO and Founder of Cares, Inc. ("Cares"). (Holbert Testimony.) She has also served as Cares' lead dog trainer for over thirty years. (*Id.*) She trained Herbie to be a service dog for a child who has a seizure disorder. (*Id.*) She paired Herbie with M.D. and his mother in March 2024. (*Id.*)

Plaintiffs called Ms. Alyssa Seymour ("Ms. Seymour") as their second witness. Ms. Seymour lives in East Memphis and works as a music therapist. (Seymour Testimony.) She graduated from the University of Alabama with a degree in music therapy, and she has worked as a music therapist for about two years. (*Id.*) She has worked with the Dietz family since April 2023. (*Id.*) She visits the Dietz home once a week for two hours. (*Id.*) During the visits, she spends 30 minutes with each of the Dietzes' children, and so she spends 30 minutes a week with M.D. (*Id.*)

Plaintiffs then called Ms. Hayley Royal ("Ms. Royal") as their third witness. Ms. Royal is a graduate student studying speech language pathology at the University of Memphis. (Royal Testimony.) She is in a two-year program that ends in May 2025. (*Id.*) Ms. Royal has babysat

---

[2] In the summary below, the Court provides general citations to witness testimony. But in the analysis section, the Court gives specific citations to the record.

for the Dietz family since August 2023.  (*Id.*)  She babysits for them between 3 and 10 hours a week.  (*Id.*)  She has observed M.D. and Herbie.  (*Id.*)

Plaintiffs called M.D.'s mother, Ms. Sarah Dietz ("Ms. Dietz") as their fourth witness. Ms. Dietz is married to Mr. Douglas Dietz ("Mr. Dietz").  (Dietz Testimony.)  And they have four children: M.D., N.D., J.D., and E.D.  (*Id.*)  Plaintiffs also recalled Ms. Dietz as a rebuttal witness at the end of the hearing.  (*Id.*)

Plaintiffs called M.D.'s special education teacher, Ms. Isabelle Spiotta ("Ms. Spiotta"), as their fifth witness.  Ms. Spiotta was also a witness for Germantown.  She lives in East Memphis and works at Dogwood Elementary ("Dogwood").  (Spiotta Testimony.)  She started working at Dogwood in August 2022—the fall of M.D.'s first grade year—and she is a special education teacher in a self-contained classroom.  (*Id.*)  She was M.D.'s teacher for first grade, second grade, and third grade (until he left Dogwood).  (*Id.*)  She attended University of Tennessee for her undergraduate and graduate studies.  (*Id.*)  She finished her undergraduate degree in May 2021 and her master's degree in May 2022.  (*Id.*)

As its second witness, Germantown called Ms. Sarah Huffman.  She is the Assistant Superintendent for Exceptional Student Education.  (Huffman Testimony; Exh. 58.)  As part of her duties, she supervises the special education programs for Germantown.  (Huffman Testimony.)  She is familiar with M.D. and has been in her position the whole time M.D. has been at the district.  (*Id.*)

Germantown called Ms. Rebecca Borgman ("Ms. Borgman") as its third witness. (Borgman Testimony.)  Ms. Borgman is an occupational therapist for Germantown.  (*Id.*)  She provided services to M.D. and is mostly assigned to Dogwood Elementary.  (*Id.*)  She explained that she typically provided services to M.D. twice a week for 20 to 30 minutes a session.  (*Id.*)

Sometimes she provided services in her own classroom and sometimes in Ms. Spiotta's classroom. (*Id.*)

As its final witness, Germantown called Ms. Jessica Woody ("Ms. Woody"). (Woody Testimony.) Ms. Woody is the principal at Dogwood. (*Id.*) This is her sixth year as the principal, although she has been with the district for twenty-six years. (*Id.*) She was previously the Assistant Principal at Houston Middle School for 12 years. (*Id.*)

The Court will now summarize the testimony as it relates to M.D., his needs, Herbie, and the timeline of events.

## II.    M.D.

M.D. is the nine-year-old son of Mr. and Ms. Dietz. (Dietz Testimony.) M.D. was born with a genetic mutation, a micro-deletion of 2q. (*Id.*) This is an exceedingly rare genetic condition. (*Id.*) As a result, M.D. struggles with physical, emotional, and cognitive disabilities. In fact, Ms. Dietz is only aware of one or two other children in the world with the same genetic mutation as M.D. (*Id.*)

M.D. has a twin brother, N.D., who was born with Down syndrome. (*Id.*) M.D. and N.D. are nine years old and currently in third grade. (*Id.*) M.D. also has a younger brother, J.D., and a younger sister, E.D. (*Id.*)

M.D. was born with hypertonia and flexed digits (his fingers are tightly clinched). (*Id.*) He has decreased range of motion in all limbs and decreased strength. (*Id.*) He can walk, but he has balance problems. When he falls, he has trouble pushing up. (*Id.*) And his right leg is stronger than his left leg. (*Id.*) M.D. had his eleventh surgery this past December. (*Id.*)

M.D. was also diagnosed with epilepsy, a seizure disorder. (*Id.*) For his seizures, he has been on six medications over the past two years. (*Id.*) Finding the right medication has proven

difficult.  The doctors use a trial-and-error approach.  (*Id.*)  If M.D. has a seizure while on a medication, the doctors start him on a new medication.  (*Id.*)  But once M.D. stops taking a medication, he can never go back on that medicine.  (*Id.*)  In the fall of 2024, the doctors changed M.D.'s seizure medicine and whenever that happens, Ms. Dietz notices an increase in seizures.  (*Id.*)  M.D. typically has at least one seizure per day, but he can have up to 10 to 15 a day.  (*Id.*)  If M.D. has a seizure lasting more than three minutes, someone needs to administer rescue medicine.  (*Id.*)  He is also prone to having "cluster" seizures—a series of short seizures back-to-back.  (*Id.*)

M.D. also has cognitive and developmental delays.  (*Id.*)  He is mostly non-verbal, but he tries to speak.  (*Id.*)  And so M.D. struggles to communicate effectively.  When others do not understand him, M.D. tends to get frustrated and exhibits "negative behaviors."  (*Id.*)  Examples of these negative behaviors include hitting, kicking, screaming, and throwing things.  (*Id.*)  And M.D. needs prompting and cueing in all areas of his life.  (*Id.*)

To help communicate, M.D. has an Augmentative and Alternative Communication ("AAC") device, also called M.D.'s "talker."[3]  (*Id.*)  The AAC device allows one to record their voice saying words and then to assign that recording to a tab or button.  Then the user of the AAC can touch the tab later on the screen and the "talker" will say the word.  Several witnesses testified about M.D.'s ability to use his talker.  For example, Ms. Spiotta testified that M.D. could use the talker to communicate basic needs and wants.  (Spiotta Testimony.)  But for anything beyond that, M.D. needs heavy prompting.  (*Id.*)  Ms. Seymour testified that she has seen M.D. use his talker before.  (Seymour Testimony.)  She added that he has used it in their

---

[3] An AAC device is an electronic tablet, like an iPad, that helps someone with a speech or language impairment to communicate by voicing words or phrases that the person cannot say on their own.

music therapy sessions a few times.  (*Id.*)  Ms. Royal testified that M.D. does not use his talker

much at home.  (Royal Testimony.)  And she has only seen him use it as a way to command

Herbie when someone prompts him to do so.  (*Id.*)

### III.    Herbie and Cares

#### A.    Cares

Herbie was trained as a service dog at Cares.  (Holbert Testimony).  Cares is a for-profit

organization that trains and places service dogs with persons who need them.  (*Id.*)  Cares is

licensed in Kansas and West Virginia and is in good standing with the Kansas Secretary of State.

(*Id.*)  Ms. Holbert founded Cares in 1994 and is its CEO.  (*Id.*)  As the CEO, she handles the

business aspects of Cares, and she has also served as Cares' lead dog trainer for over thirty years.

(*Id.*)  She has trained and placed about 2,000 service dogs.  (*Id.*)  And she has trained and placed

over 600 service dogs for children, many of whom took the dogs to public school.  (*Id.*)  Ms.

Holbert is unaware of any school excluding one of these dogs.  (*Id.*)

To apply for a service dog from Cares, the applicant must send two letters of

recommendation and documentation of their disability.  (*Id.*)  The typical wait time to receive a

service dog from Cares is 18 to 24 months.  (*Id.*)  Once Cares has a dog picked out for a person,

the applicant receives a letter telling them when their week-long training session will be.  (*Id.*)

Cares then receives a deposit.  (*Id.*)  A service dog from Cares costs $7,000, while the national

average for a service dog is about $26,000.  (*Id.*)  According to Ms. Holbert, Cares' dogs cost

less because, being in north central Kansas, Cares' overhead costs are lower.  (*Id.*)  Also Cares

breeds its own dogs and other breeders donate dogs to them.[4]  (*Id.*)  Cares seeks to get qualified and affordable dogs to families.  (*Id.*)

Cares trains the dogs using a "positive reinforcement" method.  (*Id.*)  And Cares' training process has many steps.  (*Id.*)  The exact training methods can differ depending on the dog, as each dog is different and is trained to assist with a specific disability.  (*Id.*)  That said, in general, puppy training begins when the dog is eight to ten weeks old.  (*Id.*)  And Cares continues this training daily until the dog is placed with a new owner.  (*Id.*)  To do this, Cares works with six correctional facilities to train the dogs.  (*Id.*)  At these facilities, inmate handlers train the puppies.  (*Id.*)  Cares uses correctional facilities since inmates can be with the dogs at all times.  (*Id.*)  The dog goes anywhere its inmate handler goes, including to educational events or religious ceremonies.  (*Id.*)  The inmate handler is evaluated and must give monthly reports on the dog.  (*Id.*)  Typically the dog remains at a correctional facility for about 8 months.

After training at correctional facilities, the dogs return to Cares for advanced training and spend time in volunteer social homes.  (*Id.*)  Lastly, the dogs complete a week-long training with their new owners.  (*Id.*)  The dogs must also pass a public access test.  (*Id.*)  And Cares is willing to give the new owners additional training after the week-long training.  (*Id.*)  Indeed, families with a new Cares dog can call, email, text, or make an appointment with Cares to get assistance.  (*Id.*)  Ms. Holbert has also provided training to schools.  (*Id.*)  She has done school meetings on zoom and by phone.  (*Id.*)  And she has even attended schools with students.  (*Id.*)

Ms. Holbert gave more specifics about how Cares trains the dogs.  (*Id.*)  For example, every dog, from the time it is a puppy, is taught to go to the bathroom on command.  (*Id.*)  The

---

[4] Cares breeds its own labradors and golden retrievers, but other puppies are donated to them by breeders.  (Holbert Testimony.)

command is "take a break." (*Id.*) According to Ms. Holbert, on average a dog needs to go to the bathroom five times a day and should have the opportunity to go at least once at school or at work. (*Id.*)

And as a part of their training, the dogs are trained to stay next to their handler.[5] (*Id.*) The handler is the primary person at the end of the leash giving commands to the dog. (*Id.*) A nonverbal child can command a dog by using either hand signals or an augmented speech device. (*Id.*) Typically, the person with the disability is also the handler. (*Id.*) But Ms. Holbert testified that there needs to be a backup handler who knows the commands and who can take the dog to the bathroom. (*Id.*)

Ms. Holbert testified that the dogs are not robots and do not alert 100% of the time, especially for people with seizure disorders. (*Id.*) The dogs, for whatever reason, may miss a cue. (*Id.*) It is possible something new is happening, that it is a new type of seizure. (*Id.*) Nor do all dogs alert the same way, and a dog may not alert the same way to every seizure and every situation. (*Id.*) And service dogs need rest. (*Id.*)

What is more, Ms. Holbert confirmed that it is important to consistently reinforce a service dog's training and that if a service dog has a break in training, its skills may lapse. (*Id.*) If so, it may take time and repetition to get the service dog's skills back to an acceptable level. (*Id.*) Ms. Holbert also compared how a dog learns to how a child learns. (*Id.*) She explained that if a service dog goes to a place without rules or boundaries, then the dog will do whatever they are allowed to do. (*Id.*) But when the dog returns to a place with rules and boundaries, the

---

[5] According to Ms. Holbert, the dogs can have some free will, but they always know what is happening with their handler, even if they are a few feet away. (Holbert Testimony.) The dogs need not be next to their disabled person to alert to a medical issue. (*Id.*)

dog will follow the rules. (*Id.*) With this in mind, she compared service dog training to how a child may act with their grandparents who are more permissive, unlike how that child acts with their parents who are more strict. (*Id.*)

### B. Herbie's Training

The Dietz family decided to get a service dog because M.D. was diagnosed with epilepsy and his seizures were getting progressively worse. (Dietz Testimony.) M.D. had three seizures in a row that caused him to be hospitalized. (*Id.*) And M.D.'s neurologist, Dr. Patterson, recommended that the Dietz family consider a service dog for M.D. (*Id.*) So the Dietz family applied for a service dog from Cares in either August 2022 or August 2023. (Dietz Testimony; Holbert Testimony.) In March 2024, Ms. Dietz and M.D. attended a week-long training in Kansas and picked up Herbie. (Holbert Testimony.)

Herbie, the service dog in this case, spent time in two correctional facilities during his training. (*Id.*) After training in the correctional facilities, Herbie received advanced training from about September 2023 until March 2024. (*Id.*) During the advanced training, Herbie spent around six weeks in a social home and then received skills training during February 2024 and March 2024. (*Id.*) Also during the advanced training, Cares decided with whom Herbie would be placed. (*Id.*) But Cares always has in mind what each dog would be suited to do. (*Id.*)

In the fall of 2023, Ms. Holbert was working with around 30 dogs. (*Id.*) Other Cares staff members who would have worked with Herbie included Isabelle Blackwood, a junior in high school, Becca Boatner, a twenty-year-old, and Kailey Chambers, an eighteen-year-old. (*Id.*) As a part of the advanced training, one activity Cares did was take Herbie to an elementary school where they taught the students about service dogs. (*Id.*)

9

During his training, Ms. Holbert trained Herbie to recognize seizures using scent training. (*Id.*)  In this training, a dog is trained to look for a new odor or an odor not typical to a person. (*Id.*)  She explained that when a person has a seizure, their body changes chemically and electrically.  (*Id.*)  And the person's body odor changes.  (*Id.*)  A service dog is then looking for when those changes happen.  (*Id.*)  So Ms. Holbert trains the dogs to alert when they detect a new scent.  (*Id.*)

Cares also trained Herbie to brace to assist with M.D's limited mobility.  (*Id.*)  Bracing is when the dog prepares itself by stiffening its legs to help their person physically.  (*Id.*)  This would allow M.D. to use Herbie to stand up when he falls.  (*Id.*)

As stated above, Herbie spent six weeks in a volunteer social home.  (*Id.*)  This home included parents and an adult child with autism who also has a seizure disorder.  (*Id.*)  The family lives in the Springfield, Missouri area.  (*Id.*)  The adult son is in his early 20s and has his own service dog.  (*Id.*)  The family is familiar with the commands and what socializing means to a service dog.  (*Id.*)  Herbie went everywhere with the parents for six weeks.  (*Id.*)  And they made sure to expose Herbie to their grandchildren, the youngest of which was four years old. (*Id.*)

As the final step, Ms. Dietz and M.D. attended training at Cares from March 11, 2024, through March 15, 2024.  (Dietz Testimony.)  Around 18 new teams were receiving training that week.  (Holbert Testimony.)  The new handlers learned how to hold a leash, how to walk the dogs, and the commands.  (*Id.*)  The week included lectures on nutrition, playtime, and dog psychology.  (*Id.*)  At the end of the week, Herbie passed the public access test.  (*Id.*)

During the week-long training, the new owners went on outings with the dogs.  (Dietz Testimony.)  As M.D. has communication difficulties, they worked on hand signs with Herbie.

(*Id.*)  Because of M.D.'s flexed fingers, they had to modify the signs.  (*Id.*)  When working on

commands, M.D. would make the movement and then Ms. Dietz would say the command while

standing behind M.D.  (*Id.*)  They did this because they wanted to ensure Herbie understood that

M.D. was the main handler.  (*Id.*)

Ms. Holbert testified that, at the beginning of the week, Ms. Dietz helped with Herbie,

but by the end of the week, M.D. was "pretty" independent with Herbie.  (Holbert Testimony.)

But she also testified that when M.D. gave a gross motor command, his mom would reiterate that

command.  (*Id.*)  Likewise, she could not recall whether she saw M.D. using his AAC device.

(*Id.*)  And M.D. never went outside by himself—his mom or a staff member would help him.

(*Id.*)  She testified that there were times she observed M.D. get frustrated, but it was not directed

at Herbie.  (*Id.*)  And she testified that she thought Herbie and M.D. would succeed, and she had

no concerns about Herbie accompanying M.D. at school.  (*Id.*)  Herbie was housebroken when

paired with the Dietz family.  (*Id.*)

Ms. Holbert also testified that during the week-long training, she remembers that M.D.

had a seizure.  (*Id.*)  She did not remember when in the week the seizure happened.  (*Id.*)  But

she explained that M.D. was sitting at a table next to his mom and she saw M.D. slump down.

(*Id.*)  Ms. Holbert further explained that she encouraged Ms. Dietz to interact with Herbie at the

time.  (*Id.*)  She testified that she did not know how long the seizure lasted as she did not time it.

(*Id.*)

## IV.    M.D. and Herbie at Home and in Public Spaces

### A.    Testimony

As for M.D.'s conduct toward Herbie, Ms. Dietz has seen M.D. hit and kick him, poke

him in the eyes, and pull his tail.  (Dietz Testimony.)  She explained that when M.D. has trouble

communicating, he gets frustrated, so these behaviors are his way of trying to communicate his point. (*Id.*) But Ms. Dietz has not seen M.D. do anything to Herbie that resulted in Herbie acting aggressively. (*Id.*) According to Ms. Dietz, sometimes M.D. needs cues to command Herbie but other times he does not. (*Id.*) Also, Ms. Dietz testified that, aside from one event at school, Herbie has never had a bathroom accident. (*Id.*)

Ms. Seymour, the Dietz family's music therapist, testified about Herbie in the Dietz home, where she works with M.D. (Seymour Testimony.) She explained that Herbie is normally at M.D.'s side or laying down right where they are. (*Id.*) She testified that Herbie has never sniffed her anywhere inappropriate, that she has never seen Herbie eat out of the trash can or eat food not meant for him, and that she has never seen Herbie be aggressive toward anyone or have an accident. (*Id.*) She stated that she has seen some Dietz children playfully pull at Herbie's tail before. (*Id.*) She explained that, when she has seen a child pull at his tail, Herbie did not react and just sat there. (*Id.*)

Ms. Royal, the Dietz family's babysitter, testified about Herbie in the Dietz home as well. (Royal Testimony.) She said that at the house, typically Mr. or Ms. Dietz give Herbie commands, not M.D. (*Id.*) She described Herbie as a relaxed dog, who is normally beside M.D. (*Id.*) Herbie has never jumped on Ms. Royal or sniffed her inappropriately. (*Id.*) She stated that when the Dietz family first got Herbie, there were a few instances when he would eat food off the floor, but that he has not done so recently. (*Id.*) She has never seen Herbie take food from a child. (*Id.*) And she has never seen Herbie eat anything out of the trash. (*Id.*) She said that the trash is inside a cabinet, but that the cabinet is often left open. (*Id.*) She has never seen Herbie engage in aggressive behavior. (*Id.*)

Ms. Royal testified that she has seen the Dietz children poke at Herbie and pull at his tail and ears. (*Id.*) When this happens, she explained that Herbie typically ignores it, but that if it bothers him, he will get up and move to a different spot. (*Id.*) And she testified that she has seen M.D. hit Herbie. (*Id.*)

And Ms. Royal testified that she has seen Herbie alert to M.D.'s seizures. (*Id.*) First, Herbie will start alerting M.D. (*Id.*) He will nudge M.D., put his head in his lap, and lick his hands or face. (*Id.*) Then Herbie will go to Ms. Dietz. (*Id.*) He will nudge Ms. Dietz and put his paws on her. (*Id.*) If Ms. Dietz is not present, Herbie will come to the babysitter (Ms. Royal). (*Id.*) Once he gets an adult, Herbie will come back and stand over M.D.'s legs or sit by M.D. (*Id.*)

### B.     Video Evidence

The Court admitted into evidence videos of Herbie at home or in public with the Dietz family. The first video is from the first or second day after they met Herbie in Kansas and they brought him to the hotel where Ms. Dietz and M.D. stayed. (Exh. 5.) It shows M.D. walking back and forth in a hotel room with Herbie. (*Id.*) The video also shows M.D., Ms. Dietz, and Herbie working on commands. (*Id.*)

The next video shows M.D. walking Herbie outside into the back yard to go to the bathroom on August 8, 2024. (Exh. 6.) The video shows M.D. slowly walking Herbie outside with the crossbody lead. (*Id.*) Ms. Dietz explained that walking with Herbie in this way is good for M.D. because it helps him slow down and concentrate. (*Id.*) The following video, Exhibit 7, was also from August 8, 2024, after Herbie went to the bathroom. (Exh. 7.) As Ms. Dietz explained, Exhibit 7 shows Mr. Dietz opening the trash bin and M.D. throwing away a bag with one of Herbie's bowel movements. (*Id.*)

Exhibit 14 is a video of Herbie and M.D. at a dance party at Hollywood Studios in Disney World on May 27, 2024.  (Exh. 14.)  Herbie was being still and lying down.  (*Id.*) Exhibit 15 is a shorter video taken just before Exhibit 14.  In Exhibit 15, a child jumped toward Herbie, and Herbie stood up.  (Exh. 15.)  Herbie then laid back down after an adult put him in a "down wait" position.  (*Id.*; Dietz Testimony.)  Exhibit 16 shows the Dietz family eating at Chef Mickey's, a restaurant in their hotel at Disney World.  (Exh. 16.)  Herbie was laying underneath the table.[6]  (*Id.*)

Plaintiffs then introduced several home videos of M.D.'s seizures and Herbie's alerts. For example, Exhibit 17, the first of these videos, showed Herbie trying to get Mr. Dietz's attention.  (Exh. 17.)  In the video, Herbie is continuously panting and nudging Mr. Dietz.  (*Id.*) Mr. Dietz keeps saying "easy" and "we see him," but Herbie continues to get more restless.  (*Id.*) Ms. Dietz explained that Herbie behaves this way when he is detecting a change with M.D.'s behavior and no one is responding.  (Dietz Testimony.)  Ms. Dietz testified that M.D. had a seizure shortly after the video recording ended.  (*Id.*)

Exhibit 18 is a video of M.D. having a seizure in the Dietzes' TV room.  (Exh. 18; Dietz Testimony.)  Mr. Dietz took this video on November 10, 2024.  (Exh. 18; Dietz Testimony.)  The video shows Ms. Dietz touching M.D. in various places with no response from M.D.  (Exh. 18.) She explained that, because M.D. stops moving, his seizures are not always easy to diagnose. (Dietz Testimony.)  So she touches him because, if he is not having a seizure, M.D. will swat her hand away.  (*Id.*)  In the video Herbie was standing next to M.D., and Ms. Dietz stated that this

---

[6] On this trip to Disney World, Ms. Dietz testified that there were no issues.  (Dietz Testimony.) They went to Magic Kingdom, Epcot, Hollywood Studios, and Animal Kingdom (except for a few areas not recommended for service dogs).  (*Id.*)  They ate at a different sit-down restaurant each day.  (*Id.*)  Mr. and Ms. Dietz controlled Herbie's walking at the parks.  (*Id.*)  But M.D. would get Herbie on and off rides and would cue Herbie to go under the table at meals.  (*Id.*)

was an example of Herbie alerting to a seizure.  (Exh. 18; Dietz Testimony.)  Exhibit 19 is

another video, taken just a minute after Exhibit 18.  (Exh. 19.; Dietz Testimony.)  This video is

like Exhibit 18.  (Exh. 19.)  Ms. Dietz explained that M.D. had come out of the first seizure and

was going into a second seizure in this video.  (Dietz Testimony.)  In this video, Herbie is

standing next to M.D.  (Exh. 19.)  Ms. Dietz described Herbie as being hyper-focused on alerting

that M.D. is having a seizure or in distress.  (Dietz Testimony.)

Exhibit 20 is a video of M.D. sitting at the table having a seizure on January 10, 2025.

(Exh. 20.)  Herbie is licking M.D.'s hands.  (*Id.*)  Exhibit 21 is from the same day.  (Exh. 21.)

This shows M.D. having a seizure while Herbie paces back and forth under the table apparently

trying to get to M.D.  (*Id.*)

Plaintiffs then introduced a few more videos of M.D. and Herbie.  In Exhibit 22, M.D.

uses Herbie as a brace to stand up.  (Exh. 22.)  And Exhibit 23 shows M.D. playing on January

14, 2025.  (Exh. 23.)  At first, Herbie was standing behind and then following M.D.  (*Id.*)  Then,

at the end of the video, Herbie walks away from M.D.  (*Id.*)  Exhibit 24 shows M.D. pouring

food for Herbie.  (Exh. 24.)  And the second one, admitted into evidence as Exhibit 25, shows

M.D. eating yogurt at the counter.  (Exh. 25.)  Herbie is nearby, but he does not try to eat M.D.'s

food or eat any of the food on the floor.  (*Id.*)

## V.   Herbie's General Behavior at Dogwood

School staff members testified about Herbie's behavior at Dogwood.  The Court provides

its observations here, and then later will summarize more information about Herbie and M.D.

during spring 2024, summer 2024, and fall 2024.

M.D.'s special education teacher, Ms. Spiotta, testified about Herbie in the classroom.

(Spiotta Testimony.)  She explained that Herbie would wander in the classroom and get the

"zoomies"—which meant he would run around the classroom uncontrollably. (*Id.*) She has witnessed Herbie have the zoomies both outside and inside her classroom. (*Id.*) The Court admitted into evidence as Exhibit 55 a video of Herbie walking around the classroom without M.D. leading him. (Exh. 55.) There was no evidence that M.D. was having a seizure at that point. (*Id.*)

And Ms. Spiotta testified that typically Herbie would not follow M.D.'s commands. (Spiotta Testimony.) So she tried to assist M.D. with commanding Herbie. (*Id.*) But when she would redirect Herbie to stay in one spot, he would get back up and chew on toys, sniff, and eat food.[7] (*Id.*) And Herbie would only respond after three or four commands. (*Id.*) Any time Herbie would misbehave and not listen to a command, Ms. Spiotta would have to stop what she was doing to assist M.D. with Herbie. (*Id.*) Or if M.D. was aggressive with Herbie, she would have to stop what she was doing. (*Id.*) She said she continuously had to address Herbie's behavior, and she could not teach M.D. and the other students. (*Id.*) She also stated that Herbie's presence did not assist in her teaching process and it instead greatly impaired her ability to do her job. (*Id.*) Ms. Spiotta testified that had Herbie not been disruptive, she would have been eager for Herbie to come to her class at Dogwood. (*Id.*)

Ms. Spiotta also testified about Herbie's alerts. (*Id.*) She stated that she has seen Herbie do things when M.D. has had seizures. (*Id.*) But Ms. Dietz gave a lengthy list of ways Herbie alerts. So it got to a point where it was hard to tell if Herbie was alerting because almost

---

[7] Ms. Spiotta testified that when Herbie would eat food, she would first try to prompt M.D. to use the talker to get Herbie to stop and then she would command Herbie by saying "no sniff." (Spiotta Testimony.) According to Ms. Dietz's testimony this is not the correct command— "leave it" is the correct command. (Dietz Testimony.) But on cross-examination, Ms. Spiotta clarified that she would need to see M.D.'s AAC device to know what command she gave. (Spiotta Testimony.)

everything he did might be an alert.  (*Id.*)  She also testified that there were multiple times where Herbie would fail to alert when M.D. did have a seizure.  (*Id.*)

And Ms. Spiotta testified that she had observed M.D. hit and kick Herbie.  (*Id.*)  To address this behavior, she said that, according to Ms. Dietz's instructions, she would take Herbie and place him behind M.D.  (*Id.*)  Sometimes this would work, but other times, M.D. would stand up or Herbie would not stay where she placed him.  (*Id.*)  She said M.D. would chase the dog and try to hit him.  (*Id.*)  Ms. Spiotta testified that she told Ms. Dietz about these behaviors at car line and, at first, Ms. Dietz responded that this was a bonding experience.  (*Id.*)

Dogwood's principal, Ms. Woody, also testified about observing Herbie disrupting the classroom.  (Woody Testimony.)  She has seen Herbie wandering around the classroom.  (*Id.*)  She stated that the most disruptive behavior was when Herbie would not follow M.D.'s commands or anyone's commands.  (*Id.*)  She also testified about M.D.'s behavior toward Herbie.  (*Id.*)  She said one time Herbie was laying down at M.D.'s feet, and M.D. was stomping on Herbie's leg repeatedly.  (*Id.*)  Herbie got up and moved.  (*Id.*)

Assistant Superintendent, Ms. Huffman, also testified about Herbie's behavior at school. (Huffman Testimony.)  She testified when she was in the room, she would see M.D. try to give a command and Herbie ignore him.  (*Id.*)  M.D. would try to give commands either orally or with his talker and Herbie would not respond.  (*Id.*)  And then M.D. would go toward the dog to hit or kick him.  (*Id.*)  She testified that one time, she saw Herbie eat out of the trash can.  (*Id.*)  And she saw Herbie eating food off the floor two or three times.  (*Id.*)  When she would come into classroom, Herbie would run to greet her by pawing her and sniffing her crotch.  (*Id.*)  She has also seen M.D. chase Herbie down the hallway.  (*Id.*)

Ms. Huffman testified that she was once in the room when M.D. had a seizure.  (*Id.*)
Herbie was drinking water across the room.  (*Id.*)  She said it was obvious that Herbie was not
alerting to M.D.'s seizures.  (*Id.*)  She explained that Dogwood was following the Herbie Manual
Ms. Dietz gave them,[8] but the instructions in the Manual did not work with Herbie.  (*Id.*)

Ms. Borgman, an occupational therapist who provided services to M.D. at Dogwood,
testified about Herbie's behavior at school.  (Borgman Testimony.)  She testified that Herbie
would typically greet her when she would walk into the classroom.  (*Id.*)  Sometimes Herbie
would come up and sniff her crotch.  (*Id.*)  When she would work with M.D. in the classroom,
Herbie would sometimes be laying in his bed, sometimes he would walk around the room, and
sometimes he would be by M.D.  (*Id.*)  And Ms. Borgman has observed Herbie sleeping in the
classroom.  (*Id.*)  When Herbie would walk around the classroom, he would sniff at items, nose
the trash, and sniff the trash.  (*Id.*)  He would also mouth toys in the classroom.  (*Id.*)  Ms.
Borgman described an occasion when Herbie chased another disabled student around the room.
(*Id.*)

Ms. Borgman has seen M.D. hit and kick Herbie.  (*Id.*)  And she has seen M.D. hit Herbie
with his talker.  (*Id.*)  When this would happen, Herbie would usually move away from M.D.
(*Id.*)  She explained an incident where M.D. was pulling on Herbie's ears and then Herbie nipped
at M.D.  (*Id.*)  Ms. Borgman saw Herbie's teeth, but the teeth did not touch M.D.'s skin.  (*Id.*)
Ms. Borgman also described a time when M.D. almost fell because M.D. had dropped the leash,
and the loop of the cross-body lead circled his feet.  (*Id.*)  Herbie then started walking away and
the loop caught on M.D.'s feet.  (*Id.*)  Ms. Borgman had to lean down to prevent M.D. from
falling.  (*Id.*)

---

[8] The Court will explain more about this Manual below in the section about the spring of 2024.

Ms. Borgman also testified about M.D.'s seizures and Herbie's alerts. (*Id.*) She

explained that she once saw M.D. have a seizure while sitting on a bean bag chair and Herbie

was on his bed across the room. (*Id.*) She testified that she has only seen Herbie alert to a

seizure once and that she has never seen Herbie alert to a seizure that she did not already know

about. (*Id.*)

And Ms. Borgman explained that she used the Herbie Manual to give commands. (*Id.*)

She explained that if she wanted Herbie to come closer to M.D. or sit down, she would prompt

M.D. to use his AAC device, which M.D. could do. (*Id.*) While there were occasions when

Herbie would obey the first time, Herbie would often ignore M.D and not respond to the talker

without multiple tries. (*Id.*) If Herbie would not listen to M.D., Ms. Borgman would say

"Herbie come." (*Id.*)

## VI.    Dogwood Service Dog Policy

Germantown has a policy on the use of service animals at school. (Exh. 60.) The policy

generally provides: "Under the Americans With Disabilities Act, a 'service animal' is defined as

a dog that has been individually trained to do work or perform tasks for an individual with a

disability. The task(s) performed by the dog must be directly related to the person's disability."

(*Id.*) The Policy's Student Service Animals section goes on to state:

> Parents/guardians shall direct all requests that a service animal be permitted to
> accompany their child at school and/or school sponsored activities to their child's
> school Principal. Within two (2) business days of the request, the Principal shall
> schedule a meeting to discuss the request.
>
> Except in situations where it is obvious that the dog is a service animal, the Principal
> or their designee/s may ask during the meeting the following questions: (1) is the
> dog a service animal required because of a disability and (2) what work or task has
> the dog been trained to perform. No GMSD employee may request any
> documentation for the dog or require that the dog demonstrate its task. The student
> is responsible for caring for and supervising the service animal, which includes
> toileting and cleaning up after the animal; however, if a student's disability

precludes the student from performing the aforementioned tasks, this issue should be discussed during the meeting between the Principal or their designee and the student's parent/guardian.

Service animals must be permitted to accompany their handlers to and through self-service food lines.  Service animals must be under the control of the handler at all times.  The service animals must be harnessed, leashed, or tethered while at any GMSD school or at any school sponsored activity.  If a service animal is out of control and the handler does not take effective action to control it and/or if the animal is not housebroken, the Principal or their designee may ask the service animal be removed from the premises.

Allergies and fear of dogs are not valid reasons for denying access to service dogs.  However, when a person who is allergic to the dog dander and a person who uses a service animal must spend time in the same room or facility, they both should be accommodated.

(*Id.*)

## VII.    Germantown Municipal School District and Other Service Dogs

Herbie is not the only service dog that has attended one of Germantown's schools.  Ms. Woody testified that when she worked at Houston Middle School, a student had a service dog for many years.  (Woody Testimony.)  And Ms. Woody testified there were no incidents of uncontrollable behavior with the service dog at Houston Middle School.  (*Id.*)  The dog would walk right beside the student and lay on the floor in class.  (*Id.*)  If the dog was alerting, it would put its head or paws in the student's lap, but otherwise the dog was on the floor.  (*Id.*)  Ms. Woody testified that she has no objection to having service animals in Germantown schools. (*Id.*)

Ms. Huffman's testimony corroborated Ms. Woody's on these points.  (Huffman Testimony.)  Ms. Huffman explained the staff at Houston Middle School hardly knew the service dog was there, the dog was like an extension of the student.  (*Id.*)  And the student was the one leading the dog.  (*Id.*)  Ms. Huffman added that a service dog is scheduled to start this year after spring break at another school in the district.  (*Id.*)

## VIII.  Spring 2024: M.D., Herbie, and Dogwood

In the spring of 2024, M.D. was in second grade.  (Spiotta Testimony.)  The Court admitted into evidence several school forms from that year.  These include M.D.'s Individual Education Program ("IEP"), Functional Behavior Assessment ("FBA"), and Behavior Intervention Plan ("BIP").  (Exhs. 2, 3, 4.)

Also in the spring of 2024, Ms. Spiotta's classroom had four adults, Ms. Spiotta and three paraprofessionals.  (Spiotta Testimony.)  And during that semester, Ms. Flowers was always the paraprofessional who accompanied M.D. to general education.  (*Id.*)  Also during this semester, there were five students in Ms. Spiotta's classroom, including M.D.  (*Id.*)

Ms. Woody learned in December 2023 or January 2024 that Herbie would be joining M.D. at Dogwood.  (Woody Testimony.)  After M.D. got Herbie, but before Herbie came to school, Ms. Dietz and Ms. Woody spoke by phone.  (*Id.*)  According to Ms. Woody, Ms. Dietz stated the dog's name was Herbie, that they had been to a week of training, and that M.D. and Herbie were still getting used to each other.  (*Id.*)  She said that they were still learning signs to communicate and Herbie was still learning to alert.  (*Id.*)  And they were teaching Herbie how to alert as M.D. had seizures.  (*Id.*)  Ms. Woody added that Ms. Dietz explained that Herbie should be able to go about seven hours without needing to use the restroom, but Ms. Dietz said she would come up and take him to the restroom.  (*Id.*)

Herbie joined M.D. at school in March 2024, around four days after Ms. Dietz and M.D. returned from picking Herbie up from Cares.  (Dietz Testimony.)  Ms. Dietz gave the school a folder with information about Herbie and his commands ("Herbie Manual" or "Manual").  (*Id.*; Exh. 1.)  In creating this Manual, Ms. Dietz used examples from Cares.  (Dietz Testimony.)  Ms.

Dietz testified that she offered training and videos to Dogwood, but that the school said the Herbie Manual was enough. (*Id.*)

But Ms. Spiotta, M.D.'s special education teacher (the teacher with whom M.D. spends the most amount of time), explained that Ms. Dietz gave her the Herbie Manual *and* taught her the most used commands when she brought Herbie the first day. (Spiotta Testimony.) Indeed, on Ms. Spiotta's copy of the Herbie Manual, fifteen commands are highlighted and Ms. Spiotta explained that she highlighted the commands Ms. Dietz provided examples for when she first brought Herbie to school. (*Id.*; Exh. 1.) And the Manual states, "Only [M.D.], as the handler, is allowed to give Herbie commands. The teacher and paras will have to encourage [M.D.] to make the appropriate signs or use his device to give Herbie the commands. If Herbie fails to listen to [M.D.], then the teacher or para will need to assist [him]." (Exh. 1 at Page 3.) Ms. Huffman explained that the district did not need more training after reading what Ms. Dietz provided in the Manual. (Huffman Testimony.)

Ms. Dietz testified that in March 2024, she asked the school to provide a consistent one-on-one paraprofessional throughout the day for M.D. (Dietz Testimony.) Ms. Dietz wanted to have the same paraprofessional helping M.D. with commands and responding to Herbie's alerts. (*Id.*) Although a consistent para was not written on the IEP, Ms. Dietz confirmed that M.D. did always have a paraprofessional in the classroom. (*Id.*) And Ms. Spiotta testified that the same paraprofessional, Ms. Christy Flowers, always went with M.D. to general education class. (Spiotta Testimony.)

Ms. Dietz testified that she asked the school to help make sure the lead was correctly positioned on Herbie's collar. (Dietz Testimony.) She explained that M.D. would come home with the lead connected to the vest, but that the lead should have been connected to the collar for

M.D. to effectively control Herbie while walking.  (*Id.*; Exh. 40.)  Text messages corroborate that Ms. Dietz made this request.  (Exh. 40.)  Ms. Dietz testified that to her knowledge, Germantown did not refuse the accommodation.  (Dietz Testimony.)

Ms. Dietz also testified that she asked that the school make sure that the volume on M.D.'s AAC device was turned up so that M.D. could command Herbie.  (*Id.*)  Ms. Dietz testified that Germantown did not refuse this request, but twice (once in the spring and once in the fall) M.D. came home with the volume on the device turned down.  (*Id.*)  Ms. Dietz testified that sometimes M.D. will repeatedly push buttons on the device.  (*Id.*)  Ms. Spiotta testified that they put a volume limit on the AAC device because M.D. would hit buttons repeatedly to make noises or say "brown bear" over and over and it distracted the other students.  (Spiotta Testimony.)  But even with the volume limit, it was loud enough for Herbie to hear, and they never set it at a level so low that the dog could not hear it.  (*Id.*)

Ms. Dietz testified that she received little feedback from Dogwood about Herbie in the spring of 2024.  (Dietz Testimony.)  She stated that she did not receive any report that Herbie was behaving aggressively or that M.D. was acting inappropriately toward Herbie.  (*Id.*)  She also did not receive any reports that Herbie was not housebroken.  (*Id.*)

But Dogwood teachers and staff members testified that they did provide feedback about Herbie during the spring 2024 semester.  For example, Ms. Spiotta explained that she would talk to Ms. Dietz when she dropped M.D. off in the morning, when she came to take Herbie to the bathroom, and when she came to pick M.D. up in the afternoon.  (Spiotta Testimony.)  If there was something that needed to be brought to Ms. Dietz's attention, she would do it at those times.  (*Id.*)

23

What is more, the Court admitted into evidence many text messages between Ms. Spiotta and Ms. Dietz from the spring of 2024. (Exhs. 31–36, 38–49.) In these text messages, Ms. Spiotta and Ms. Dietz typically discuss M.D.'s seizures or the best time for Ms. Dietz to come take Herbie outside.[9] (*Id.*) But one text message exchange relays concerns about Herbie's behavior. (Exh. 33.) In relevant part, Ms. Dietz stated on April 29, 2024:

> Does Herbie eat stuff on the floor that [M.D.] drops? He should not…if [M.D.] can't give the leave it command then someone else should…the same goes with sniffing people…I just noticed he was doing that more than normal this morning.

(*Id.*) Ms. Spiotta then responded:

> Yes, he does it even when we tell him to leave it. [M.D.] has also started feeding him from the table. We are trying to stop that habit as well.

(*Id.*) Ms. Dietz then responded:

> Ok…we need to figure out what to do. At home we yank the lead and say leave it, then take the food out of his mouth…probably not something you're comfortable doing at school. Interesting that [M.D.] is feeding him because if he accidentally drops something at home and Herbie eats it he gets upset.
>
> If he is eating from [M.D] or licking his hands, then he may need to be moved a little further away because he can't eat the food.

(*Id.*)

In addition, Ms. Woody testified that she attended three to four meetings with Ms. Dietz where Herbie's behavior was brought up. (Woody Testimony.) She testified that two to three of these were in the spring and one was by phone. (*Id.*) Ms. Woody testified that she called Ms. Dietz in April 2024 about a kicking incident. (*Id.*) She had seen M.D. kick Herbie six times in a row. (*Id.*) She explained that she did not want Herbie to get hurt and she was worried that Herbie was eventually going to respond aggressively. (*Id.*) According to Ms. Woody, Ms.

---

[9] For example, on March 28, 2024, and April 3, 2024, Ms. Dietz informed Ms. Spiotta of new seizure symptoms. (ECF Nos. 31, 32.)

Dietz's response to this was that this sometimes happens and perhaps M.D. was not feeling well. (*Id.*)

Ms. Woody and Ms. Huffman specified that they met with Mr. and Ms. Dietz to discuss Herbie's behavior in May 2024. (*Id.*; Huffman Testimony.) Ms. Woody and Ms. Huffman shared concerns about Herbie, including that Herbie was not following commands, that M.D. was hitting and kicking Herbie, that M.D. was pulling Herbie's tail and poking his eyes, and that Herbie was eating out of the trash can. (Woody Testimony; Huffman Testimony.)

## IX.    Summer 2024: M.D., Herbie, and ESY

In the summer of 2024, M.D. attended extended school year ("ESY") at Forest Hills Elementary with Herbie. (Dietz Testimony; Huffman Testimony.) Ms. Anne Chaney was M.D.'s teacher at ESY. (Exh. 30.) On June 4, 2024, Ms. Dietz sent Ms. Chaney an email that stated:

> Mrs. Chaney,
>
> I'm really sorry to hear that today was a struggle for the boys [M.D. and his brother], as well as, Herbie. Did you ever get the manual for Herbie or do I need to bring another copy? I am wondering if the boys and Herbie having to learn a new routine at the new school is worth it for the summers… I feel like it takes us the 4 weeks to get into a routine…add Herbie to that this year and it could be chaos. Let me know what you think. We can always come up there for more training with [M.D.] and Herbie as needed. Do you know when Mrs. Christy is supposed to be back? Thanks
>
> Sarah Dietz.

(*Id.*) Ms. Spiotta testified that she had forgotten to provide the Herbie Manual to the ESY teachers and staff. (Spiotta Testimony.) And so Ms. Dietz printed off the commands for the teacher. (Dietz Testimony.)

The Court admitted two videos of Herbie during ESY into evidence as Exhibits 56 and 57. Exhibit 56 shows Herbie running in the school gymnasium. (Exh. 56.) In the video, Herbie

is not near M.D.  (*Id.*)  And Exhibit 57 shows Herbie in the same school gym walking away from

M.D.  (Exh. 57.)  The video shows M.D. being unable to catch the dog.  (*Id.*)[10]

On June 7, 2024, Ms. Dietz emailed Ms. Huffman requesting a meeting to figure out

what types of accommodations could be made for M.D. and Herbie at ESY.  (Exh. 58.)  Ms.

Huffman testified that although Ms. Dietz wrote this email, the idea for the meeting was not

coming from Ms. Dietz.  (Huffman Testimony.)  Ms. Erin Rhodes, the ESY principal, had been

bringing concerns to Ms. Dietz's attention often at dismissal.  (*Id.*)

Ms. Huffman responded to the email on Monday, June 10, 2024, stating that she and Ms.

Rhodes could meet with Ms. Dietz the next day.  (Exh. 55.)  A meeting then took place at the end

of the first week of ESY.  (Huffman Testimony.)  They discussed issues in the gym and

hallways.  (*Id.*)  Ms. Huffman testified that Ms. Dietz's first response was that they were just

going to pull M.D. out.  (*Id.*)  But the school staff emphasized how they wanted M.D. there and

to work with them and they convinced Ms. Dietz to leave M.D. in ESY.  (*Id.*)

M.D. ended up not finishing the entire ESY term.  The record is unclear as to why.  It

was either because he was struggling with the summer session[11] or because he had to go to

Dallas, Texas, for a surgery.  (Dietz Testimony.)

## X.    Fall 2024: M.D., Herbie, and Dogwood

### A.    Before September 18, 2024

The fall semester started on August 7, 2024.  (Dietz Testimony.)  In Ms. Spiotta's

classroom during the 2024–2025 school year, four adults—Ms. Spiotta and three

---

[10] Plaintiffs suggested that they had not seen the videos of Herbie at school until the preliminary
injunction hearing.  Perhaps if Germantown would have shared the videos with the Dietz family
before the hearing, it may have saved the parties time and expense.
[11] M.D. was struggling with his medication and was not sleeping well at the time.  (Dietz
Testimony.)

paraprofessionals—worked with five disabled students, including M.D.  (Spiotta Testimony.)
And during this semester, two paraprofessionals would switch going to general education with
M.D., Ms. Ann Gee and Ms. Christy Flowers.  (*Id.*)  As for M.D.'s school day, Ms. Spiotta
explained that M.D. was in home room for 15 minutes a day, phonics for 20 minutes a day, math
for 20 minutes a day, MAPS for 45 minutes a day, lunch for 25 minutes a day, and recess for 20
to 30 minutes a day.  (*Id.*)  And the rest of the school day he was in her class.  (*Id.*)  And so he
spent most of the school day with Ms. Spiotta.  (*Id.*)

Before the school year started, Ms. Dietz asked that she, M.D., and Herbie be able to
walk around the school to help M.D. adjust to the new setup.  (*Id.*)  And Ms. Woody granted this
request.  (*Id.*)  Emails indicating this request was granted were admitted into evidence as Exhibit
26.  (*Id.*; Exh. 26.)  Ms. Spiotta testified that, before the school year started, Ms. Dietz brought
M.D. to school twice to retrain Herbie—once during "meet the teacher day" and once during a
teacher workday.  (Spiotta Testimony.)

Ms. Dietz testified that from her perspective, the first week of school seemed to go fine.
(Dietz Testimony.)  But Ms. Dietz testified that at the beginning of the fall of 2024, she did not
receive any communication about M.D. for the first eight days of school.  (*Id.*)  She stated for
example that M.D. would come home in new clothes, which typically meant he had an accident.
(*Id.*)  But she was not receiving communication from the school on this.  (*Id.*)

And during the first week of school, Herbie had a bowel movement in the classroom at
school.  (*Id.*)  Ms. Dietz described it as nine piles of poop, half being diarrhea.  (*Id.*)  A
photograph of the accident was admitted into evidence as Exhibit 53.  (Exh. 53.)  The accident
happened at the end of the day, on a rug in a classroom.  (*See id.*; Dietz Testimony.)  At Ms.
Spiotta's request, Ms. Dietz came to the school and cleaned the accident.  (Dietz Testimony.)

She offered to get the rug professionally cleaned or purchase a new rug for the classroom, but

Dogwood never took her up on this offer.  (*Id.*)  Ms. Dietz explained that the accident happened

because the family was trying to have Herbie go the entire day without a bathroom break.  (*Id.*)

In the fall of 2024, Dogwood began sending M.D. home with weekly reports about

Herbie.  (*Id.*)  The reports cover the time from August 12, 2024, to September 13, 2024.  (Exh.

10.)  These reports reflect that Herbie was acting inappropriately at school.  (*Id.*)  For example,

the notes section of the Weekly Report from 8/12/24–8/16/24 states:

- [M.D.] could be observed kicking, hitting, pulling his tail, & throwing objects
  at Herbie.
- At certain points in the day, Herbie starts running around the classroom, gym,
  playground, etc.  [M.D.] is unable to provide proper commands to stop the
  behavior.
- When Herbie displays this behavior [M.D.] is unable to grab the leash to control
  the situation.

(*Id.*)  The weekly logs for the later weeks include similar notes.  (*Id.*)  And several of the weekly

reports reflect that M.D. fell while walking with Herbie.  (*Id.*)

Ms. Dietz testified that these came home in M.D.'s backpack and that she was taken

aback by the reports.  (Dietz Testimony.)  She felt like they were observations without context,

and she thought that some behaviors could have been alerts.  (*Id.*)  Ms. Dietz received the first

weekly report on August 16, 2024.  (*Id.*)  She then called an IEP addendum meeting.  (*Id.*)

There was an IEP addendum meeting on August 22, 2024.  (Exh. 11.)  Ms. Dietz testified

that about 80% of the meeting was about Herbie.  (Dietz Testimony.)  At the meeting, Ms. Dietz

offered for her or her husband to come in and show the staff the correct commands.  (*Id.*)  She

also offered for Ms. Holbert to train over Zoom or in person, or for dog fosterers in the area to

come observe and be an objective observer. (*Id.*) Ms. Dietz also sent a follow-up email with

these offers. (*Id.*) Dogwood did not take Ms. Dietz up on any of the offers.[12] (*Id.*)

Ms. Dietz added that at this meeting, she had expressed concern that she had not received

seizure logs from the school. (*Id.*) The school agreed to make a seizure log noting when and

how long the seizures were lasting. (*Id.*) According to Ms. Dietz, Ms. Spiotta stated at the

meeting that she had seen M.D. have short seizures but that she did not think they mattered, so

she dismissed them. (*Id.*) When Ms. Spiotta testified, she denied making this statement.

(Spiotta Testimony.)

Dogwood then started keeping seizure logs and sending them home in M.D.'s backpack.

(*Id.*) The seizures logs were admitted into evidence as Exhibit 12. (Exh. 12.) Ms. Dietz stated

that the duration of the seizures on the logs did not correlate with the duration at home. (Dietz

Testimony.) The logs reflected that the seizures typically lasted only a matter of seconds, but,

according to Ms. Dietz, the seizures at home were typically 30 seconds or longer. (*Id.*) The logs

included several notes indicating that Herbie did not alert to M.D.'s seizures. (*Id.*)

At first, the school created the log forms. (*Id.*) But Ms. Dietz was concerned that the

logs mainly included notes about Herbie's behavior rather than notes about M.D. and so Ms.

Dietz gave the school a new log form to use. (*Id.*) The school used these new log forms as

requested and started including more information about M.D. (*Id.*; *see* Exh. 12 at Page 7.)

---

[12] Ms. Woody testified that at one point, Mr. and Ms. Dietz asked to be able to come to the
classroom and observe M.D. with the dog. (Woody Testimony.) But Ms. Woody explained that
she thought if the parents came to observe, M.D. and Herbie would behave differently. (*Id.*) She
explained that she could not take a video to show Ms. Dietz because of privacy concerns with
other students. (*Id.*) Ms. Woody said that she was trying to come up with a solution, but there
was never a solution determined. (*Id.*)

Ms. Dietz also testified about receiving Daily Dolphin Notes[13] ("Daily Notes") about

M.D.  (Dietz Testimony; Exh. 13.)  Ms. Dietz testified that the Daily Notes admitted into

evidence as Exhibit 13 came from the fall of 2024.  (Dietz Testimony.)  She added that Daily

Notes were not sent home with M.D. until the first or second week of school, and she could not

remember whether they started before or after the IEP addendum meeting.  (*Id.*)  But Ms. Spiotta

testified that she sent Daily Notes home since day one and that she started sending them home in

August 2022.  (Spiotta Testimony.)  Because they were not dated, Ms. Spiotta could not say what

year the Daily Notes in Exhibit 13 were from, except she confirmed that the ones including the

"Today's GLOW and Today's GROW" sections were from the fall 2024 semester.[14]  (*Id.*)

According to Ms. Spiotta, at the IEP addendum meeting, Ms. Dietz said that she wanted

more communication.  (*Id.*)  Ms. Dietz testified that, at the meeting, she had expressed that the

Daily Notes were mainly negative, and that she wanted them to include positive things about

M.D. as well.  (Dietz Testimony.)  And so Dogwood updated the Daily Notes to highlight a good

part of day.  (Spiotta Testimony.)  This is why any Daily Note that includes "Today's GLOW

and Today's GROW" sections is from the fall of 2024.  (*Id.*; Exh. 13 at Pages 12–20.)

Several Daily Notes from the fall 2024 semester describe issues with Herbie.  One

explains that "[M.D.] needs to work on nice hands with Herbie."  (Exh. 13.)  Another states,

"[M.D.] was feeding Herbie from the table.  We prompted him to keep food to himself, but he

continued until lunch was over."  (*Id.*)  Likewise, a third note states that "[M.D.] needs to

---

[13] Daily Dolphin Notes are the way Ms. Spiotta communicated with all parents about how their
child was doing in her class.
[14] The Daily Notes are not dated, except for an occasional date added by Ms. Dietz.  (Dietz
Testimony; Exh. 13.)

continue working on having a calm body with Herbie." (*Id.*)  And the final note states, "[M.D.] was very aggressive & noncompliant to both Herbie & teachers." (*Id.*)

**B.    September 18, 2024, to Present**

Ms. Dietz went to Dogwood to take Herbie outside to the bathroom on September 18, 2024,[15] and she testified that she did not notice anything different about that day.  (Dietz Testimony.)  The Daily Note for September 18, 2024, conveyed that M.D. was aggressive and noncompliant toward Herbie and teachers.  (Exh. 13 at Page 20.)  A school event called "Boosterthon" was happening that day and the day before, and Ms. Dietz explained how that would be a change in M.D.'s routine.  (Spiotta Testimony; Dietz Testimony.)  But Ms. Spiotta testified that this was not a major change for the students, as Boosterthon just involves running around in MAPS class.  (Dietz Testimony.)

On September 18, 2024, Ms. Woody called Mr. and Ms. Dietz and asked them to come to the school.  (Dietz Testimony; Woody Testimony.)  At this school meeting, Ms. Woody notified the family that Herbie was no longer welcome at Dogwood.  (Dietz Testimony; Woody Testimony.)   According to Ms. Dietz, at the meeting, Ms. Woody told Ms. Dietz that it had been a rough day, that there had been issues since day one, and that Herbie was no longer welcome at Dogwood.  (Dietz Testimony.)  And Ms. Dietz testified that Ms. Woody did not give any specific behaviors of M.D. or Herbie that concerned her.  (*Id.*)  Ms. Dietz asked that, given that Herbie could not come to school, whether Dogwood would provide a full-time nurse for M.D., and Ms. Woody stated that would not be necessary.  (*Id.*)  Ms. Dietz got up and left halfway through the meeting.  (*Id.*)

---

[15] Except for a brief time period in the fall of 2024, Mr. or Ms. Dietz came to Dogwood each day to take Herbie outside to go to the bathroom.  (Dietz Testimony.)

But, in some respects, Ms. Woody's version of this meeting differed. (Woody Testimony.) She testified that she called the Dietz parents in to discuss Herbie. (*Id.*) Ms. Woody stated that, at the meeting, she shared information that had been shared with them many times. (*Id.*) She explained that Herbie was sniffing other students; that M.D. could not handle Herbie; that Herbie was not listening to M.D., the talker, or adults; that Herbie was chewing toys; that Herbie was eating out of the trash can; and that M.D. was repeatedly hitting, kicking, poking Herbie. (*Id.*) Overall, Herbie was too disruptive. Ms. Woody testified that at this meeting she told Mr. Dietz and Ms. Dietz that Herbie was not welcome back. (*Id.*) Ms. Woody testified that both Mr. and Ms. Dietz were distressed and they said they planned to call an attorney. (*Id.*) Ms. Dietz left the meeting, but Mr. Dietz stayed another moment or two. (*Id.*)

They exchanged follow-up emails after this meeting. (Exh. 61.) These emails explain that Germantown would allow M.D. to have a service dog, but that Herbie was no longer welcome at Dogwood. (*Id.*) Likewise, Ms. Woody testified that if Ms. Dietz wanted to send M.D. back to Dogwood, they would take him back. (Woody Testimony.) And Ms. Diez testified that she is unaware of any fact that Germantown's decision to no longer allow Herbie to accompany M.D. to school was based on M.D.'s disability. (Dietz Testimony.) And Ms. Dietz is not claiming that Dogwood refused to provide educational services. (*Id*.)

After the meeting with Ms. Woody, there was one more IEP meeting at the school about M.D. (*Id.*) But the parties did not discuss Herbie at the meeting. (*Id.*) Ms. Huffman testified that Dogwood staff had assumed the meeting would be about Herbie. (Huffman Testimony.) But before the meeting, Dogwood received an email outlining three pages of concerns, none of which related to Herbie. (*Id.*) And at the meeting Herbie was not brought up. (*Id.*) Instead, the

parents brought up programming and stated that they wanted the school to move M.D. into general education. (*Id.*)

After September 18, 2024, M.D. and his brother N.D. did not attend Dogwood again. (Dietz Testimony.) After M.D. stopped attending, a school staff member reached out and asked if the family would like a service plan, but the family declined.[16] (Huffman Testimony.) Ms. Dietz officially withdrew M.D. from Dogwood in October 2024. (Dietz Testimony.) M.D. and N.D. are both homeschooled now. (*Id.*) Ms. Dietz has also removed her younger son, J.D., from Dogwood. (*Id.*) Ms. Dietz does not want M.D. to return to Dogwood without Herbie. (*Id.*)

## XI.    Requests for Relief

Plaintiffs ask this Court to order that Herbie be allowed to join M.D. at Dogwood. (Closing Arguments.) And Ms. Dietz testified that she would like Germantown to help with Herbie by prompting or cueing M.D. (*Id.*) This would involve cueing M.D. to ensure he gives proper commands.[17] (*Id.*) Ms. Dietz would also like Dogwood to help with Herbie if M.D. is having a seizure. (*Id.*) And school staff would need to give Herbie water.[18] (*Id.*)

And Plaintiffs' Motion for a Preliminary Injunction included requests. (ECF No. 2.) Plaintiffs request an order (1) requiring training of all teachers and staff who work with M.D. about identifying, recording, and responding to M.D.'s seizures, and (2) requiring training of all teachers and staff who work with M.D. about medical alert service dogs and Herbie, in

---

[16] A service plan could allow a student to receive speech, occupational, or physical therapy even if they are not attending school.

[17] For example, Ms. Dietz testified that if Herbie was walking around the classroom, it would be the responsibility of Germantown to prompt M.D. to command Herbie. (Dietz Testimony.)

[18] This would involve Ms. Dietz providing the water and Dogwood staff giving the water to Herbie. (Dietz Testimony.) Text messages between Ms. Dietz and Ms. Spiotta confirm that they operated this way when Herbie attended Dogwood with M.D. (Exh. 38.) Ms. Dietz testified that if she provided water in a smaller container M.D. could give the water to Herbie (Dietz Testimony), but the Court has not seen evidence of this.

particular, to learn how Herbie is trained and the commands he is trained to respond to, how and

why Herbie alerts to seizures and other medical conditions, how to respond to Herbie's alerts,

and how M.D. has learned to command and control Herbie.  (*Id.*)  Plaintiffs also request that the

order require Dogwood to (3) provide an AAC device that M.D. is able to use while also acting

as Herbie's handler that allows for recorded commands to which Herbie responds; (4) facilitate

M.D.'s commands and control of Herbie by ensuring the volume on his AAC device is loud

enough for Herbie to hear and respond to commands; (5) facilitate periodic observation for Mr.

and Ms. Dietz to provide guidance and ongoing training and troubleshooting when issues arise;

(6) work with Mr. and Ms. Dietz to determine the best leash and harness options for Herbie and

M.D. in the school setting; and (7) provide someone to take Herbie out to the bathroom in the

middle of the day.  (*Id.*)[19]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, "[t]he purpose of a preliminary injunction is

merely to preserve the relative positions of the parties until a trial on the merits can be held."

*S.B. ex rel. M.B. v. Lee*, 566 F. Supp. 3d 835, 843 (E.D. Tenn. 2021) (citing *Univ. of Tex. v.*

*Camenisch*, 451 U.S. 390, 395 (1981)).  In other words, preliminary injunctions should "balance

---

[19] In Plaintiffs' supplemental briefing filed after the five-day hearing and without leave of Court, Plaintiffs state "[t]he Dietz family would have provided (and could provide) more support – including an adult handler – had that been necessary and the school allowed it."  (ECF No. 31 at PageID 195–96.)  This is the first time Plaintiffs have stated that they can provide an adult handler for Herbie.  In fact, in their Motion for a Preliminary Injunction, Plaintiffs did not request that a family-provided adult handler be able to accompany M.D. and Herbie to school. (ECF No. 2-1 at PageID 76.)  Indeed, Plaintiffs provide no evidence or information about who this handler would be and, likewise, the Court does not know the credentials of the potential handler.  Just as Plaintiffs did not inform the Court of their willingness to provide a handler until after the hearing, the Court has received no evidence about the handler and does not know Germantown's position on this matter.  And so the Court declines to consider Plaintiffs' supplemental statement that they could provide an adult handler for Herbie.

the equities as the litigation moves forward." *Brown v. Greene Cnty. Vocational Sch. Dist. Bd. of Educ.* 717 F.Supp.3d 689, 696–97 (S.D. Ohio 2024).  In determining whether to grant a preliminary injunction then, courts should consider whether: (1) the movant has shown a strong likelihood of success on the merits; (2) the movant will suffer irreparable harm without an injunction; (3) an injunction would harm others;[20] and (4) an injunction would serve the public interest.  *Id.*; *see also D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019).

"These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020).  And when a court can "determine the propriety of a preliminary injunction by relying on fewer than all four factors, it may do so." *S.B.*, 566 F. Supp. 3d at 843 (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)) ("The district judge 'is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue.'").

Because preliminary injunctions are "extraordinary remed[ies] never awarded as of right," courts should only order preliminary injunctions "if the movant carries his or her burden of proving that the circumstances clearly demand it."[21] *Brown*, 2024 WL 620937, at *2 (quoting *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).  Still, the movant "is not required

---

[20] Courts also refer to this factor as "the balance of the equities." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019).

[21] "The burden of 'proof required for [a] plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion,'" *Brown*, 2024 WL 620937, at *2 (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)), because a preliminary injunction movant has a "burden of persuasion as to all of the four prerequisites" but a summary judgment plaintiff need only create a genuine dispute of material fact. *S.B.*, 566 F. Supp. 3d at 843 (quoting *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)).

to prove his case in full at a preliminary injunction hearing." *S.B.*, 566 F. Supp. 3d at 843 (citing *Camenisch*, 451 U.S. at 395). Lastly, the "granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court." *Z.H. v. Ky. High Sch. Athletic Ass'n*, 359 F. Supp. 3d 514, 520 (W.D. Ky. 2019) (quoting *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 260–61 (6th Cir. 1977)).

## ANALYSIS

### I.    Failure to Accommodate

#### A.    Generally

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021). As the Sixth Circuit recently pointed out, "Title II does not expressly define 'discrimination' to include a refusal to make a reasonable accommodation." [22] *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314,

---

[22] In a Notice following the hearing—which amounts to uninvited, supplemental briefing—Plaintiffs assert that "the provisions of the service animal regulation do not supersede the general requirements to provide a reasonable accommodation or modification." (ECF No. 31 at PageID 197.) The Court will address the interplay between a reasonable accommodation and the service animal regulations later in this Order. But first, the Court will address one of the authorities Plaintiffs rely on. Plaintiffs cite 42 U.S.C. § 12201(f). (*Id.* at PageID 192, 197.) Section 12201(f) is found in Title V of the ADA, which includes miscellaneous provisions applicable to the ADA. Section 12201(f) states:

Nothing in this Act alters the provision of section 12182(b)(2)(A)(ii) of this title, specifying that reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures, including academic requirements in postsecondary education, would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations involved.

326 (6th Cir. 2023); *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020).  Rather the regulations

implementing the ADA state that "[a] public entity shall make reasonable modifications in

policies, practices, or procedures when the modifications are necessary to avoid discrimination

on the basis of disability, unless the public entity can demonstrate that making the modifications

would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. §

35.130(b)(7); *Bennett*, 86 F.4th at 326; *see Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 159–60

(2017) ("A regulation implementing Title II requires a public entity to make 'reasonable

modifications' to its 'policies, practices, or procedures' when necessary to avoid such

discrimination.").

Neither party challenges the reasonable-modification regulation (28 C.F.R. §

35.130(b)(7)), and both sides rely on it in their briefing.  (*See* ECF No. 2-1 at PageID 67; ECF

No. 20 at PageID 117–18.)  And so the Court will follow the regulation and recognize a failure to

---

Section 12201(f) refers to Section 12182(b)(2)(A)(ii), which is found in Title III of the ADA.  In short, Title III applies to public accommodations and services operated by private entities, *not* public entities like Germantown Municipal School District.  *S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 852 (E.D. Tenn. 2021) (citing reference omitted) ("Title I protects disabled individuals from discrimination in the workplace; Title II protects their access to public services; and Title III protects their access to public accommodations.").  Plaintiffs seem to be using Section 12201(f) to try to bring a statutory provision, Section 12182(b)(2)(A)(ii), from Title III into Title II.  But this is not how the Court reads Section 12201(f), and the Court has seen no binding precedent that treats Section 12201(f) this way.  *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) ("Title II does not expressly define 'discrimination' to include a refusal to make a reasonable accommodation.").

Instead, the Court views Section 12201(f) as clarifying that nothing in the ADA alters Section 12182(b)(2)(A)(ii), not as a means to transport Section 12182(b)(2)(A)(ii) into Title II.  That said, a *regulation* implementing Title II does require that public entities like Germantown make "reasonable modifications … unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  But, because this case involves a service animal, it implicates another regulation.  *See* 28 C.F.R. § 35.136.  And, in any event, as will be discussed throughout this Order, Plaintiffs have not shown that their requested accommodations are reasonable, and the Court finds that the requested accommodations would likely fundamentally alter the services involved.

accommodate claim as cognizable at this preliminary injunction stage.[23]  *Cf. Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020) ("We need not reconcile these cases here, as the [defendant] does not challenge the reasonable-modification regulation under the statute."); *Bennett*, 86 F.4th at 326 ("Defendant below expressly waived any argument that failure-to-accommodate claims are not cognizable, so we will not examine that issue further.").  Moving now to the analysis of the Title II claims.

To show discrimination under Title II, a plaintiff must show that "(1) he has a qualifying disability, (2) he is otherwise qualified for a program, and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under a program because of his disability."  *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024).  And under a failure to accommodate theory, a plaintiff establishes the third prong by showing the defendant reasonably could have accommodated his disability but refused to do so and that this failure to accommodate impeded his "ability to participate in, or benefit from, the subject program."  *Id.*; *Knox*, 62 F.4th at 1000.

"Title II does not require a plaintiff to receive [his] preferred accommodation but merely a reasonable one that provides meaningful access to the public entity."  *Bennett*, 86 F.4th at 326 (internal citations and quotations omitted).  And "the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry."  *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners*, 870 F.3d 471, 489 (6th Cir.

---

[23] The Court views any argument that this regulation is invalid as waived for purposes of resolving this preliminary injunction.  While the Court is not deciding the legitimacy of the regulation at this stage because neither party has argued the regulation is invalid, the Court notes the Supreme Court opinion in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) has changed the way courts review regulations.  In any event, whether the regulation is binding here or only persuasive, this Court's analysis and conclusion would not change at this stage.  The Court does not prohibit either party from making *Loper Bright* arguments later in this litigation.

2017) (internal quotations omitted).  Indeed, "[t]he hallmark of a reasonable accommodation is

effectiveness." *S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 856 (E.D. Tenn. 2021)

(citing *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016)).

### B.    Defenses and Service Animal Regulations

Title 28 C.F.R. § 35.130(b)(7) describes the duties of public entities to provide

accommodations.

> A public entity shall make reasonable modifications in policies, practices, or
> procedures when the modifications are necessary to avoid discrimination on the
> basis of disability, unless the public entity can demonstrate that making the
> modifications would fundamentally alter the nature of the service, program, or
> activity.

28 C.F.R. § 35.130(b)(7).  This regulation thus requires a public entity to make "reasonable

modifications" in order "to avoid discrimination on the basis of disability."  28 C.F.R. §

35.130(b)(7); *see Fry*, 580 U.S. at 159–60.  The regulation also includes a defense that a public

entity may raise.  Under that defense, the public entity need not make "a reasonable

modification" if it "would fundamentally alter the nature of the service, program, or activity."  28

C.F.R. § 35.130(b)(7); *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1336

(S.D. Fla. 2015); *Bennett*, 86 F.4th at 327.

A public entity may raise another general defense in the context of service animals.  That

is, the public entity may exclude an individual, if they pose "a direct threat to the health or safety

of others."  28 C.F.R. § 35.139(a).  And "by extension, if an individual's use of a service animal

poses a direct threat, it may be excluded under this provision."  *Bennett*, 86 F.4th at 327 (citing

28 C.F.R. § Pt. 35, App. A.).

Also at play in this case is 28 C.F.R. § 35.136, a regulation that provides a general

presumption in favor of allowing service animals in public spaces.  This regulation provides a

general rule that "a public entity shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability."  28 C.F.R. § 35.136(a).

But Section 35.136 also sets out exceptions to this general presumption.  A public entity may exclude a service animal if "[t]he animal is not housebroken" or "[t]he animal is out of control and the animal's handler does not take effective action to control it."  *Id.* § 35.136(b).  It also specifies:

> A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (e.g., voice control, signals, or other effective means).

*Id.* § 35.136(c).[24]

And guidance from the Department of Justice on these regulations provides examples of when a dog may be "out of control."[25]  United States Department of Justice Civil Rights

---

[24] Guidance on the ADA regulations reiterates this point:

> The service animal must be harnessed, leashed, or tethered while in public places unless these devices interfere with the service animal's work or the person's disability prevents use of these devices.  In that case, the person must use voice, signal, or other effective means to maintain control of the animal.

United States Department of Justice Civil Rights Division, *Frequently Asked Questions about Service Animals and the ADA: FAQ 27*, https://www.ada.gov/resources/service-animals-faqs/ (last updated February 28, 2020).

[25] The Parties have not briefed or argued about the level of deference the Court should give the guidance here.  Options may include *Auer* deference or *Skidmore* deference.  As the Supreme Court has stated,

> *Auer* deference is not the answer to every question of interpreting an agency's rules.  Far from it.  As we explain in this section, the possibility of deference can arise only if a regulation is genuinely ambiguous.  And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation.  Still more, not all reasonable agency constructions of those truly ambiguous rules are entitled to deference.  As just explained, we presume that

Division, *Frequently Asked Questions about Service Animals and the ADA: FAQ 27*,

https://www.ada.gov/resources/service-animals-faqs/ (last updated February 28, 2020).  As the

guidance explains, "a person who uses a wheelchair may use a long, retractable leash to allow

her service animal to pick up or retrieve items.  She may not allow the dog to wander away from

her and must maintain control of the dog, even if it is retrieving an item at a distance from her."

*Id.*  And "[u]nder control also means that a service animal should not be allowed to bark

repeatedly in a lecture hall, theater, library, or other quiet place.  However, if a dog barks just

once, or barks because someone has provoked it, this would not mean that the dog is out of

control."  *Id.*  But at the same time, this guidance to the ADA adds that "[i]n the school (K-12)

context and in similar settings, the school or similar entity may need to provide some assistance

to enable a particular student to handle his or her service animal."[26]  *Id.*

---

Congress intended for courts to defer to agencies when they interpret their own
ambiguous rules.  [citation omitted].  But when the reasons for that presumption do
not apply, or countervailing reasons outweigh them, courts should not give
deference to an agency's reading, except to the extent it has the "power to
persuade."  *Christopher*, 567 U.S. at 159, 132 S.Ct. 2156 (quoting *Skidmore v. Swift
& Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

*Kisor v. Wilkie*, 588 U.S. 558, 573 (2019).

Whether this Court applies *Auer* or *Skidmore* deference, this Court's analysis and
conclusion do not change.  For the reasons explained in later sections, the level of assistance
M.D. needs to control Herbie far exceeds "some assistance."

[26] Guidance on the ADA regulations also states:

The ADA does not require covered entities to modify policies, practices, or
procedures if it would "fundamentally alter" the nature of the goods, services,
programs, or activities provided to the public.  Nor does it overrule legitimate safety
requirements.  If admitting service animals would fundamentally alter the nature of
a service or program, service animals may be prohibited.  In addition, if a particular
service animal is out of control and the handler does not take effective action to
control it, or if it is not housebroken, that animal may be excluded.

In their supplemental briefing, Plaintiffs try to deemphasize the service animal exception that allows a public entity to exclude a service animal if it is out of control.  28 C.F.R. § 35.136(b).  As Plaintiffs state, the "provisions of the service animal regulation do not supersede the general requirement to provide a reasonable accommodation or modification."  (ECF No. 31.)  But then, Plaintiffs sidestep the reasonableness analysis and jump straight to arguing that their requested accommodations do not fundamentally alter the nature of the program.  (*Id.* at PageID 132 ("Defendant bears the burden of demonstrating that 'such modifications' would 'fundamentally alter' the nature of its services or program; it has failed to do so.").)

The Court agrees with Plaintiffs that the service animal regulations do not supersede the general requirement under 28 C.F.R. § 35.130(b)(7)(i) to provide a reasonable accommodation. But the Court must still decide whether the requested accommodations are reasonable, and the Court will not skip over that analysis.  And given this case involves a service animal, the service animal regulation, including its exceptions, help guide the Court's reasonableness inquiry.[27]

## II.    Likelihood of Success: Failure to Accommodate

The Court will now turn to assessing whether Plaintiffs are likely to succeed on their failure to accommodate claim.  After discussing whether M.D. has a qualifying disability and is otherwise qualified to attend Dogwood, the Court will conduct a reasonableness analysis.  Then

---

United States Department of Justice Civil Rights Division, *Frequently Asked Questions about Service Animals and the ADA: FAQ 25*, https://www.ada.gov/resources/service-animals-faqs/ (last updated February 28, 2020).

[27] While Plaintiffs try to distance themselves from the service animal regulations in their uninvited, supplemental briefing, neither party has argued that these regulations are not entitled to deference under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  Indeed Plaintiffs acknowledge that the service animal regulation "is directly applicable."  (ECF No. 31 at PageID 191.)  Likewise, Plaintiffs and Germantown have relied on this regulation in their briefing.  (ECF No. 2-1 at PageID 68; ECF No. 20 at PageID 117.)  And so the Court will not decide whether the regulation is valid at this stage.

the Court will assess the merits of Defendant's defense that the requested accommodations

would fundamentally alter the nature of the program.  As will be described, Plaintiffs are not

likely to succeed on either point.  Their requested accommodations are likely not reasonable and

would likely fundamentally alter the nature of the program.

### A.    Disability and Otherwise Qualified

Plaintiffs and Germantown stipulated that M.D. has a seizure disorder, and Ms. Dietz

testified that M.D. has a chromosomal anomaly known as a micro-deletion of 2q and epilepsy.

(Dietz, ECF No. 34 at PageID 462, 483.)  Germantown does not dispute that M.D. is disabled.

(ECF No. 20 at PageID 116.)  Likewise, Germantown does not dispute that M.D. is otherwise

qualified for school at Dogwood.  (*Id.* at PageID 116–17.)  Plaintiffs have thus shown a

likelihood of success on the merits on these two points.  And so the only step left in the analysis

is whether Plaintiffs' requested accommodations are reasonable.

### B.    Reasonableness of Requested Accommodations

Plaintiffs seek an order from this Court that requires Germantown to allow Herbie to

attend school with M.D.  Plaintiffs also request other relief, which they claim would allow M.D.

to control Herbie.  But the Court finds it unlikely that Plaintiffs' requested accommodations are

reasonable.

### 1.    M.D. Does Not Control Herbie

Under 28 C.F.R. § 35.136(a), service dogs are generally permissible.  But that is true only

if the service dog's handler, in this case M.D., can control the dog.  *See* 28 C.F.R. § 35.136(b).

And Plaintiffs have not convinced the Court that M.D. can currently control Herbie.  In fact, the

Court finds that the evidence shows that M.D. does not maintain control over Herbie, either

physically or with commands.  *See id.* § 35.136(b)–(c).  The Court heard testimony from many

school staff members on Herbie and M.D.'s conduct at school, and the Court found these witnesses credible. And the video evidence from school corroborates this testimony.

Simply put, when M.D. gave commands at school, Herbie did not obey. (Spiotta, ECF No. 37 at PageID 949; Woody, ECF No. 38 at PageID 1068–69, 1072, 1081–82; Huffman, ECF No. 37 at PageID 992; Borgman, ECF No. 38 at PageID 1047–48.) This was true whether M.D. tried to give a sign command, a verbal command or when he tried to use his talker. (Woody, ECF No. 38 at PageID 1081.) In fact, Herbie would, at times, not respond even when school staff gave the commands. (*Id.* at PageID 1068–69, 1072; Spiotta, ECF No. 37 at PageID 915.)

Herbie wandered around the classroom. (Spiotta, ECF No. 37 at PageID 914; Woody, ECF No. 38 at PageID 1068; Exh. 55.) And he would get the "zoomies." (Spiotta, ECF No. 37 at PageID 914–15; Exh. 57.) When Ms. Spiotta would redirect Herbie to stay in one spot, he would get back up. (Spiotta, ECF No. 37 at PageID 915, 949.) At school, Herbie has also eaten out of the trash can and food off the floor.[28] (Huffman, ECF No. 37 at PageID 990.) And one time he chased a student with a disability around the room. (Borgman, ECF No. 38 at PageID 1046, 1050.) All in all, the Court finds that M.D. fails to control Herbie at school.

---

[28] And a text message from Ms. Dietz to Ms. Spiotta confirms that Herbie has had issues at home with eating food off the floor. (Exh. 33.) In relevant part, Ms. Dietz wrote: "Does Herbie eat stuff on the floor that [M.D.] drops? He should not…if [M.D.] can't give him the leave it command then someone else should…the same goes with sniffing people…I just noticed he was doing that more than normal his morning." (*Id.*) Ms. Spiotta responded: "Yes, he does it even when we tell him to leave it. [M.D.] has also started feeding him from the table. We are trying to stop that habit as well." (*Id.*) And Ms. Dietz replied: "Ok…we need to figure out what to do. At home we yank the lead and say leave it, then take the food out of his mouth…probably not something you're comfortable doing at school. Interesting that M.D. is feeding him because if he accidentally drops something at home and Herbie eats it he gets upset. If he is eating from [M.D.] or licking his hands, then he may need to be moved a little further away because he can't eat the food." (*Id.*)

The Court finds that the video evidence showed a tale of two locations. At home, where mom and dad primarily give the commands, Herbie was more controlled, and Ms. Dietz believes he alerts to M.D.'s seizures consistently. But at school, when M.D. is in charge and Ms. Dietz is not there, the videos and testimony show a completely different situation.[29] In short, at school, Herbie consistently fails to respond to M.D. or the school staff. The evidence also suggests that, at school, Herbie fails to alert to M.D.'s seizures, which will be further discussed later in this Order.

### 2.    Plaintiffs' Additional Requests

#### i.    The Other Requests Would Not Place Herbie Under M.D.'s Control

Along with wanting Herbie to accompany M.D. to school, Plaintiffs request accommodations that they claim would allow M.D. to control Herbie. Mainly, Plaintiffs ask this Court to require that Dogwood staff receive training about Herbie and his commands. (Closing Arguments, ECF No. 38 at PageID 1112.) Plaintiffs make other requests, like periodic observation time for the parents.[30] And in the abstract or in a different case, some of these

---

[29] The testimony also shows that when Herbie is at home, Ms. Dietz primarily gives the commands to him. (Royal, ECF No. 34 at PageID 456.) The Court finds that this defeats the purpose of bonding M.D. with Herbie. If the goal is for M.D. to control Herbie, then Ms. Dietz should consistently get M.D. to use his talker at home so both M.D. and Herbie get used to it. The Court recognizes that, with three other young children needing their parents, this may be easier said than done.

[30] As described earlier in this Order, in their motion, Plaintiffs ask the Court to order Germantown to (1) require training of all teachers and staff who work with M.D. about identifying, recording, and responding to M.D.'s seizures; (2) require training of all teachers and staff who work with M.D. about medical alert service dogs and Herbie, in particular, to learn how Herbie is trained and the commands to which he is trained to respond, how and why Herbie alerts to seizures and other medical conditions, how to respond to Herbie's alerts, and how M.D. has learned to command and control Herbie; (3) provide an AAC device that M.D. is able to use while also acting as Herbie's handler that allows for recorded commands to which Herbie responds; (4) facilitate M.D.'s commands and control of Herbie by ensuring the volume on his AAC device is loud enough for Herbie to hear and respond to the commands; (5) facilitate

requests may be reasonable.  *See, e.g.*, *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp.

3d 1319 (S.D. Fla. 2015).[31]  But given the specific child and service dog here, Plaintiffs' other

requests, such as extra training, are likely unreasonable for the reasons explained below.

Plaintiffs also ask that school staff prompt or cue M.D. every day to ensure he gives the proper

commands to Herbie.  (Dietz, ECF No. 38 at PageID 1106; Closing Arguments, ECF No. 38 at

PageID 1112.)  The Court will discuss this request both here and in the next section.

The Court doubts that Plaintiffs' requests would allow M.D., a third grader with severe

disabilities, to control Herbie.  *See S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 856

---

periodic observation for Mr. and Mrs. Dietz to provide guidance and ongoing training and
troubleshoot when issues arise; (6) work with Mr. and Mrs. Dietz to determine the best leash and
harness options for Herbie and M.D. in the school setting; and (7) provide someone to take
Herbie out to the bathroom in the middle of the day.  (ECF No. 2.)

[31] Plaintiffs rely on *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319 (S.D. Fla.
2015) to argue that their proposed accommodations are reasonable.  But the dog in *Alboniga* was
well-behaved, and the child did not need the level of assistance that Mr. and Ms. Dietz request
for M.D.  87 F. Supp. 3d at 1342.  As the court in *Alboniga* noted:

> Here, it is undisputed that, at all times outside of school—including while at home
> and in other public places—Stevie is tethered to A.M.  *Stevie is fully trained.*
> *Throughout the school day, Stevie simply stays by A.M.'s side.*  The sole exception
> is when Stevie needs to urinate and Stevie is trained to physically indicate (*i.e.*,
> poke) when he so requires.  *Given the specific facts here,* having Stevie tethered to
> A.M. in school would constitute control by A.M. over his service animal as the
> animal's handler within the meaning of the regulation.  As such, permitting A.M.
> to attend school with Stevie tethered to him would be a reasonable accommodation
> required of the School Board.

*Id.* (emphasis added).

Unlike the service dog in *Alboniga*, Herbie does not stay by M.D.'s side and Herbie does
not stay tethered to M.D. during the day.  And the Court finds that Herbie cannot be tethered to
M.D. all day.  In fact, M.D. at times falls when he walks with Herbie.  (Exh. 10.)  As a final
point on *Alboniga*, Plaintiffs' lawyer noted that the school in *Alboniga* allowed the student's
mother to attend school with the child and his service dog for four months.  87 F. Supp. 3d at
1325.  But the district court did not order the school to allow this, the school allowed this on its
own.  The district court made no finding on whether the mother attending school with the child
and service dog was a reasonable accommodation.

(E.D. Tenn. 2021) ("The hallmark of a reasonable accommodation is effectiveness.").  First, the Court finds that the evidence shows that Herbie does not respond to M.D.'s AAC device.  The evidence shows that, at school, Herbie often ignored M.D.—he was not close to M.D., he wandered, and he was hard to get back on track.  When Herbie attended Dogwood, school staff would cue M.D. to use the talker to command Herbie.  (Borgman, ECF No. 38 at PageID 1047; Huffman, ECF No. 37 at PageID 1022.)  But, even so, Herbie did not respond to M.D.'s commands with his talker.  (Borgman, ECF No. 38 at PageID 1047–48; Huffman, ECF No. 37 at PageID 985, 992, 1022.)  This of course frustrated M.D. and that often resulted in more disruption.  (*See* Huffman, ECF No. 37 at PageID 985.)

And, second, the Court finds Plaintiffs' position that the root issue here is that Germantown staff do not know the commands or how to cue M.D. unpersuasive. To the contrary, the proof shows that Germantown staff cued M.D. all day for many things.  (*See* Spiotta, ECF No. 36 at PageID 859.)  As for the commands for Herbie, Plaintiffs provided Germantown with the Herbie Manual, which listed many commands for Herbie.  (Dietz, ECF No. 35 at PageID 614–15; Exh. 1.)  And staff used the Herbie Manual.  (Spiotta, ECF No. 37 at PageID 910; Huffman, ECF No. 37 at PageID 1028; Borgman, ECF No. 38 at PageD 1051.)  What is more, Ms. Dietz taught Ms. Spiotta the most useful commands when she brought Herbie to Dogwood for the first day.  (Spiotta, ECF No. 37 at PageID 909–11.)  Still, Herbie would not respond to M.D.'s commands and, sometimes, would not respond when Ms. Spiotta or other staff members gave commands.[32]  (*Id.* at PageID 949; Woody, ECF No. 38 at PageID 1068–69, 1072.)

_____

[32] Ms. Spiotta testified that Herbie responded to her prompts but it took three or four attempts. (Spiotta, ECF No. 37 at PageID 949.)  She further testified that Herbie would not stay in the command she would give.  (*Id.*)

The Court finds that one reason why Herbie does not respond to M.D.'s talker is lack of practice at home. Indeed, when Ms. Holbert testified, she could not give any definite answer on whether she observed M.D. using his AAC device during the weeklong training.[33] (Holbert, ECF No. 34 at PageID 344.) And at the house, Mr. or Ms. Dietz, not M.D., typically gives Herbie commands. (Royal, ECF No. 34 at PageID 456.) Ms. Holbert gave an apt example of children getting away with behavior at their grandparents' home that would never be allowed at their parents' home. (Holbert, ECF No. 34 at PageID 401.) So too here, the proof shows that Herbie acts one way at the Dietz home and another way when he is at Dogwood. (*Compare* Dietz, ECF No. 36 at PageID 739–40, *with* Spiotta, ECF No. 37 at PageID 914–15, 949.)

If only Ms. Deitz would prompt M.D. to use the talker at home consistently rather than giving the commands herself, M.D. and Herbie might become the team she envisioned when they got Herbie. But this has not happened yet. In fact, when school staff tried to explain to Ms. Dietz the issues at school, it seems that, rather than try to solve the problems, Ms. Dietz simply did not believe the school. Her response was often that the school's descriptions lacked context or that they did not see those behaviors at home. (Dietz, ECF No. 35 at PageID 685, ECF No. 36 at PageID 732; Woody, ECF No. 38 at PageID 1089.) She viewed the school's difficulties as an inability to recognize M.D.'s seizures and Herbie's ways of alerting. (Dietz, ECF No. 36 at PageID 732.)

But consistent with Ms. Holbert's testimony, it is difficult to imagine that many of Herbie's behaviors would be alerts. (*See* Holbert, ECF No. 34 at PageID 290.) For example, Germantown has reported Herbie eating out of the trash, eating food off the floor, sniffing people

---

[33] The Court recognizes that after the weeklong training, Ms. Dietz changed the commands on the AAC device to be in her voice, rather than a computer's voice.

in inappropriate places, and chasing a student with a disability.  And although Plaintiffs tend to blame Germantown for allowing these behaviors to occur, the Court finds their position unpersuasive.

### ii.    Requested Cueing Exceeds "Some Assistance"

Another reason why Plaintiffs are not likely to succeed on their failure to accommodate claim is because the level of cueing that Plaintiffs request exceeds the amount of support Germantown needs to provide M.D. under the ADA.  Under 28 C.F.R. § 35.136(b) the handler, M.D. here, must control the service animal.  But guidance instructs that in the K-12 setting, the school "may need to provide some assistance to enable a particular student to handle his or her service animal."  United States Department of Justice Civil Rights Division, *Frequently Asked Questions about Service Animals and the ADA: FAQ 27*, https://www.ada.gov/resources/service-animals-faqs/ (last updated February 28, 2020).

Even so, given that M.D. is a nine-year-old third grader with severe physical and cognitive disabilities and that Germantown staff must give either multiple cues to him or multiple commands to Herbie before Herbie responds, the amount of prompting Plaintiffs seek here exceeds "some assistance" and thus goes beyond what qualifies as a reasonable accommodation.  As the United States District Court of the Western District of New York has explained, "if [the student] requires school district personnel to actually issue commands to [the service dog], as opposed to *occasionally reminding* [the student] to do so, then [the student] cannot be considered in control of her service dog."  *United States v. Gates-Chili Cent. Sch. Dist.*, 198 F. Supp. 3d 228, 235 (W.D.N.Y. 2016) (emphasis added).  The Court finds it likely that Plaintiffs seek more than Germantown "occasionally reminding" M.D. to give commands.  On cross-examination of staff members, counsel for Plaintiffs often asked about them needing to

prompt M.D. for his tasks of daily living.  But now they are asking for yet more prompting to keep Herbie engaged and under control.

Ms. Dietz testified that Germantown would need to cue M.D. to control Herbie every day and that the cueing would need to be specific.  (Dietz, ECF No. 38 at PageID 1103, 1106.)  Indeed, Ms. Royal testified that she has only seen M.D. use his talker to command Herbie with prompting.  (Royal, ECF No. 34 at PageID 452.)  And although the Herbie Manual explains that M.D. is the only person allowed to give commands, the Manual also states that "if Herbie fails to listen to [M.D.], then the teacher or para will need to assist [him]."  (Exh. 1.)  What is more, as described throughout this Order, it takes multiple attempts before Herbie responds to commands.  (Spiotta, ECF No. 37 at PageID 949.)

The Court recognizes that M.D. is a growing boy.  As he matures and hopefully grows stronger, his ability to control Herbie may improve.  As he continues to work with his talker and with Herbie, the two of them may become an effective team.  As it stands however, they are not.

### iii.    Use of a Service Animal

As a final point on the reasonableness analysis, the Court notes that, under 28 C.F.R. § 35.136(a), a public entity generally "must modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability."  For now, the Court finds that M.D. is an individual with a disability and that Herbie is a service animal.[34]  But the Court is less convinced that M.D.'s use of Herbie at school amounts to "the *use* of a service animal."  28

---

[34] "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability."  28 C.F.R. § 35.104.  The proof here shows that Herbie received training to be a service dog, but he fails to perform as trained at Dogwood.

C.F.R. § 35.136(a). And although the Court's ultimate decision does not rest on this point,

Herbie's failure to alert at school concerns the Court.

It is not as if M.D. has seizures at home but not at school, and so Herbie need not alert.

Instead, M.D. was having seizures at school, and Herbie was failing to alert consistently.

(Spiotta, ECF No. 37 at PageID 929.) In Ms. Huffman's words, it was obvious to Germantown

that Herbie was just not alerting. (Huffman, ECF No. 37 at PageID 1028.) Testimony from

other witnesses support this statement. (Borgman, ECF No. 38 at PageID 1045, 1052; Spiotta,

ECF No. 37 at PageID 929.) And the seizures logs corroborate the witnesses. (Exh. 12.)

Further, the few times Herbie did alert, the alerts were not needed. As Ms. Borgman explained,

Herbie never alerted to a seizure that she did not already know about. (Borgman, ECF No. 38 at

PageID 1052.)

Over time, M.D.'s seizures have changed, and Herbie's alerts have changed as well.

(Dietz, ECF No. 34 at PageID 465, ECF No. 35 at PageID 544; *see* Exhs. 31, 32.; Spiotta, ECF

No. 37 at PageID 923.) And Ms. Dietz tried to keep the school staff aware as those alerts

evolved. (*See* Spiotta, ECF No. 37 at PageID 923.) As Ms. Spiotta explained, the list of ways

Herbie alerted became so long, it got to a point where everything appeared to be an alert. (*Id.* at

PageID 928–29.) And Plaintiffs' own video evidence supports this testimony. The Court

watched five videos of Herbie alerting. (Exhs. 17–21.) And within just these fives videos, the

Court witnessed four different types of alerts. (*Id.*) Exhibit 17 shows Herbie panting and

nudging, Exhibits 18 and 19 show Herbie standing and looking at M.D., Exhibit 20 shows

Herbie licking M.D.'s hands, and Exhibit 21 shows Herbie pacing and going under the table

toward M.D. (*Id.*) The video evidence and testimony show that Herbie's services, even when

performed, are of limited use at this time.

All in all, it is unclear how M.D. could be using Herbie as a service animal at school when Herbie does not consistently perform his trained services. At a minimum, Herbie performing only limited services at Dogwood cuts against Plaintiffs' position that their many requests are reasonable.

###    3.    Housebroken

Germantown also argues that Herbie is not housebroken, and so the district may exclude Herbie from Dogwood. (ECF No. 20 at PageID 112; Closing Arguments, ECF No. 38 at PageID 1135); *see* 28 C.F.R. § 35.136(b). On this point, the Court finds that Germantown has failed to show that Herbie is not housebroken. Germantown provided proof that Herbie had one accident at school. (Exh. 53.) But, from the Court's view, providing proof of one accident is not enough to show that a dog is not housebroken.

###    A.    Defenses

As described above, Plaintiffs have not convinced the Court that the requested accommodations are reasonable. But this is not the only reason why the Court finds that Plaintiffs have not shown likelihood of success on the merits for their failure to accommodate claim. Another reason Plaintiff's claim is likely to fail is because the Court finds that Germantown is likely to succeed on its defense that the requested accommodations would fundamentally alter the nature of the service, program, or activity.

###    1.    Herbie Would Likely Fundamentally Alter the Nature of the Service, Program, or Activity

Plaintiffs argue that their requested accommodations would not fundamentally alter the nature of the service, program, or activity, but the Court disagrees. Plaintiffs explain that they "are requesting the same reasonable accommodations that Defendant already provides M.D. each and every day that he attends school: cueing and prompting." (ECF No. 31 at PageID 198.)

Plaintiffs add that "M.D. is already in a class with a near 1:1 student to staff ratio" and that M.D. does not need "a full-time handler for his service dog." (*Id.*) But the Court finds Plaintiffs' position unpersuasive.

When Herbie attended school with M.D., Germantown staff cued and prompted M.D to command Herbie. Herbie rarely responded correctly and when he did, it came after repeated commands. In fact, Germantown staff would even give commands to Herbie themselves. But Herbie would not obey. And, as explained above, the Court is unconvinced that the issue here is that Germantown staff do not know the commands or how to cue M.D. And so, the Court finds that the requested accommodations would not effectively control Herbie.

Remember, Dogwood is an elementary school and the teachers and staff are there to educate their young students. (*See* Huffman, ECF No. 37 at PageID 992.) The proof shows that the Germantown staff would have to devote so much time and attention to directing M.D. to command Herbie, repeating those prompts, and then commanding Herbie themselves that it would fundamentally alter the nature of the program and Germantown's ability to provide M.D. and other students an education. As a result, the Court finds that allowing Herbie to attend Dogwood would likely fundamentally alter the nature of the service, program, or activity.

First, Herbie is disruptive.[35] Any time Herbie would misbehave and not listen to a command, Ms. Spiotta would have to stop what she was doing. (Spiotta, ECF No. 37 at PageID 915.) And this happened continuously throughout the day. (*Id.*) She could not teach the lessons she otherwise could have. (*Id.* at PageID 915–16.) And Herbie's presence did not assist in her teaching of M.D. or more generally; instead, his presence impaired her ability to do her job. (*Id.*)

---

[35] As described above, the Court is not convinced that the requested accommodations would fix Herbie's behavior.

Second, adding Herbie into the mix forces Germantown to monitor M.D.'s negative behaviors toward Herbie.[36] At school, M.D. hit and kicked Herbie. (Borgman, ECF No. 38 at PageID 1046, 1048.) Sometimes, M.D. hit Herbie with his talker. (*Id.* at PageID 1046, 1048–50, 1060–61.) And M.D. has chased Herbie to try to hit him. (Spiotta, ECF No. 37 at PageID 933.) Once, M.D. repeatedly stomped on Herbie's leg. (Woody, ECF No. 38 at PageID 1070.)

The Court recognizes that M.D.'s negative behaviors are his way of communicating and expressing frustration. In fact, M.D. engages in negative behaviors, such as hitting and kicking, with or without Herbie. (*See* Dietz, ECF No. 34 at PageID 476–77.) But the Court finds that adding Herbie, another living being, into the equation places more responsibility on Germantown and makes M.D.'s aggression harder to manage with greater risk. In fact, Herbie is an added source of M.D.'s frustration. As Ms. Huffman testified, after Herbie would not respond to M.D.'s commands, M.D. would go toward Herbie and try to harm him. (Huffman, ECF No. 37 at PageID 985.)

Third, adding Herbie to the mix forces Germantown to monitor Herbie's behavior toward other students. For example, Herbie once chased another student with a disability around the room. (Borgman, ECF No. 38 at PageID 1046, 1050.) And the Court viewed video evidence that shows Herbie running in the gym around other students. (Exh. 56.) Likewise, if Herbie came back to school, Germantown would need to monitor Herbie's behavior toward M.D. Herbie once nipped at M.D. after M.D. pulled Herbie's ear. (Borgman, ECF No. 38 at PageID 1047–48.) And, another time, M.D.'s occupational therapist had to prevent M.D. from falling

---

[36] For example, when M.D. would hit or kick Herbie, Ms. Spiotta, per Ms. Dietz's instructions, would place Herbie behind M.D. (Spiotta, ECF No. 37 at PageID 933.) Sometimes this would work, but other times, M.D. would stand up or Herbie would not stay where she placed him. (*Id.*)

because of Herbie; M.D. had dropped the lead, which caught his feet, and then Herbie started to walk away.  (*Id.* at PageID 1049.)

As a final point, the reasons Herbie's presence would likely fundamentally alter the nature of the program mostly stem from M.D.'s lack of control over Herbie.  And, as explained above, the Court is unconvinced that Plaintiffs' proposed accommodations would allow M.D. to control Herbie.  If there comes a time when M.D. can control Herbie, this analysis and the Court's conclusion may be different then.

### 2.    Direct Threat Defense

As the Court finds that the requested accommodations are likely not reasonable and would likely fundamentally alter the nature of the service, program, or activity, the Court need not assess Defendant's direct threat defense for now.

In the end, Plaintiffs have not shown likelihood of success on the merits for their failure to accommodate claim.  The Court will now turn to whether Plaintiffs have shown likelihood of success on the merits for their intentional discrimination claim.

### III.   ADA Intentional Discrimination: Law and Likelihood of Success

Along with their failure to accommodate claim, Plaintiffs bring an intentional discrimination claim against Germantown.  A plaintiff may pursue an intentional discrimination ADA claim using either direct or indirect evidence.  *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016).  And when deciding whether there is indirect evidence of discrimination, courts use the McDonnell Douglas framework.  *Id.*

Under the McDonnell Douglas framework, a plaintiff first must make their prima facie case, which means a plaintiff must show that (1) he has a qualifying disability, (2) he is otherwise qualified for a program, and (3) he was excluded from participation in, denied the

benefits of, or subjected to discrimination under a program because of his disability.  *Anderson v.*
*City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015).  If the plaintiff makes this showing, the
burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for its
action.  *Id.*  And if the defendant meets this burden of production, the burden shifts back to the
plaintiff to show that the defendant's reason is pretextual.  *Id.*

Plaintiffs have presented no direct evidence of discrimination.  So the Court will move to
the McDonnell Douglas framework.  To satisfy the third prong of the prima facie case, a plaintiff
"must present evidence that animus against the protected group was a significant factor in the
position taken by the … decision-makers themselves or by those to whom the decision-makers
were knowingly responsive."  *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023);
*Anderson*, 798 F.3d at 357.  Plaintiffs have not made this showing.

Plaintiffs have presented no evidence suggesting that animus toward M.D. or his
disability was a significant factor in Germantown's decision to disallow Herbie.  In fact, Ms.
Dietz, while testifying, confirmed that she is unaware of any fact showing that the decision to
disallow Herbie from joining M.D. to school was based on M.D.'s disability.  (Dietz, ECF No.
36 at PageID 722.)  And although Germantown will not allow Herbie back, Ms. Woody testified
that if Ms. Dietz wanted to send M.D. back to Dogwood, they would take him back immediately.
(Woody, ECF No. 38 at PageID 1098.)

Plaintiffs also have not shown that Germantown intentionally discriminated against M.D.
because the proof shows that Germantown's concerns centered around Herbie, not M.D.
*Bennett*, 86 F.4th at 326; *see also Anderson*, 798 F.3d at 358 ("This sequence of events is
entirely consistent with the City responding to the legitimate concerns of its citizens about the
sanitation problems posed by the presence of farm animals on residential property, and provides

no basis for the inference that the City took action because of [C.A.'s] disability." (internal

citation omitted)).  In *Bennett*, the plaintiff, a nursing student, failed to show that the defendant, a

hospital, excluded her service dog because of her panic disorder.  86 F.4th at 326.  And this was

because the hospital's concerns related to the service dog.  *Id.*  Indeed, the record showed that

"the decision was motivated by staff and patient complaints of allergic reactions." *Id.*  So the

Sixth Circuit affirmed the district court's grant of summary judgment for the defendant, as the

"concerns [were] all related to [the service dog], rather than [p]laintiff's panic disorder." *Id.*

Likewise here, Germantown's concerns center around Herbie, not M.D.'s disability.  The

record here shows that the decision to exclude Herbie was because Herbie misbehaved at school.

Indeed, as has been repeatedly discussed in this Order, Herbie did not follow commands,

wandered around the room, and ate food not meant for him.

In closing arguments, Plaintiffs pointed out that one of Germantown's concerns is that

M.D. hits and kicks Herbie.  (Closing Arguments, ECF No. 38 at PageID 1120–21.)  And, in

essence, Plaintiffs argue that these behaviors stem from M.D.'s disability and so, under

Plaintiffs' theory, Germantown's concerns about Herbie are effectively concerns about M.D.

(*Id.*)  But the Court finds this position unpersuasive.  M.D.'s negative behaviors predate Herbie.

In fact, Germantown started educating M.D. long before the Dietz family got Herbie.  And

Germantown has always said they would accept M.D. back at school despite his negative

behaviors.  (*See* Woody, ECF No. 38 at PageID 1083.)  And the Court finds that Germantown's

concerns about M.D.'s behaviors toward Herbie relate to Herbie's well-being and possible

response to M.D.'s behaviors.  (*See id.* at PageID 1071–72.)

Lastly, any attempt to label Germantown's actions as mean-spirited must fail.  To start,

the text messages between Ms. Dietz and Ms. Spiotta show only care and concern on Ms.

Spiotta's part for both M.D. and Herbie.  Several messages consist of Ms. Spiotta checking in on

M.D. and his seizures.  (Exhs. 32, 34, 36.)  And other messages reflect Ms. Spiotta's willingness

to learn more about Herbie's alerts and M.D.'s seizures.  (Exhs. 31, 32.)  As for Herbie, in one

message Ms. Spiotta told Ms. Dietz about a possible cut on Herbie's paw.  (Exh. 41.)  And, in

another message, Ms. Spiotta informed Ms. Dietz of a sore on Herbie's right leg.  (Exh. 42.)

What is more, Germantown staff were repeatedly amenable to many of the Dietzes'

requests.  For example, Dogwood complied when Ms. Dietz requested the school use updated

seizure logs.  (Dietz, ECF No. 35 at PageID 550–52; *see* Exh. 12.)  Likewise, Dogwood updated

the Daily Notes when Ms. Dietz requested the school include a positive note about M.D. each

day.  (Dietz, ECF No. 35 at PageID 558.)  Germantown allowed Ms. Dietz to come to Dogwood

with M.D. on a teacher workday to retrain Herbie at the start of the fall 2024 semester.  (Spiotta,

ECF No. 37 at PageID 939.)  When Ms. Dietz debated removing M.D. from ESY, Ms. Huffman

encouraged Ms. Dietz to keep M.D. in ESY.  (Huffman, ECF No. 37 at PageID 985.)

And Germantown tried to make it work with Herbie.  Germantown staff read the Herbie

Manual to learn the commands, they helped M.D. give commands, and they would also give

commands themselves.  (Spiotta, ECF No. 37 at PageID 915, 948; Huffman, ECF No. 37 at

PageID 980, 1028.)  And, despite Herbie's poor behaviors, Germantown did not act prematurely.

It waited and allowed Herbie to come for part of the spring semester, the summer session, and

the first part of the fall semester.  (*See* Woody, ECF No. 38 at PageID 1078, 1081.)  In sum,

Plaintiffs are not likely to show that Defendant holds any animus toward M.D. or his disability.

## IV.    Section 504: Law and Likelihood of Success

Along with the ADA claims, Plaintiffs brought claims under Section 504.  *See* 29 U.S.C.

§ 794.  Both the ADA and Section 504 "authorize individuals to seek redress for violations of

their substantive guarantees by bringing suits for injunctive relief or money damages." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 160 (2017). While the two statutes have similar requirements, Section 504 has a stricter causation requirement than the ADA. *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024). Indeed, Section 504 provides "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (emphasis added).

As described above, Plaintiffs have not shown a likelihood of success on the merits on either of their ADA claims. This means Plaintiffs' claims are likely to fail under the *less strict* causation standard in the ADA. And as a result, Plaintiffs have also failed to show a likelihood of success on the merits for their Section 504 claims. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("Because Plaintiff has failed in the instant case to meet the less stringent causation standard under the ADA, we analyze her claims under the ADA and the Rehabilitation Act together."); *see also S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 852 (E.D. Tenn. 2021) ("The ADA and the Rehabilitation Act are quite similar in purpose and scope, and an analysis of a claim under the ADA roughly parallels a claim under the Rehabilitation Act so that if the plaintiff's ADA claim fails, then the plaintiff's Rehabilitation Act claim must also fail." (citing reference omitted)).

## V.    Irreparable Harm

The second factor courts consider for a preliminary injunction is whether a party will suffer irreparable harm without injunctive relief. *McGirr v. Rehme,* 891 F.3d 603, 610 (6th Cir. 2018). Irreparable harm is an "indispensable" requirement before a court can issue an injunction.

*D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Although the test for preliminary

injunctions balances each factor, "[i]f the plaintiff isn't facing imminent and irreparable injury,

there's no need to grant relief now as opposed to at the end of the lawsuit." *Id.* "Thus, although

the extent of an injury may be balanced against other factors, the existence of an irreparable

injury is mandatory." *Id.*

Harm is irreparable "if it is not fully compensable by monetary damages." *Overstreet v.

Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). To meet the

irreparable harm standard for a preliminary injunction, the movant must allege harm that is "both

certain and immediate, rather than speculative or theoretical." *Brown v. Greene Cnty.

Vocational Sch. Dist. Bd. of Educ.*, No. 3:24-CV-14, 2024 WL 620937, at *4 (S.D. Ohio Feb. 14,

2024) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154

(6th Cir. 1991)).

Because Herbie fails to alert, the Court finds that Plaintiffs will not suffer harm by

Herbie's exclusion, let alone irreparable harm. There are several adults in Ms. Spiotta's

classroom at any given time who can spot M.D.'s seizures. (Exh. 12.; *see* Spiotta, ECF No. 36 at

PageID 829, ECF No. 37 at PageID 900–02.) Indeed, the seizure logs show that school staff

noticed several seizures that Herbie missed. (Exh. 12.) And the Court finds that, at this time,

allowing Herbie back into Dogwood would detract from the staff's ability to respond to M.D.'s

seizures, given Herbie serves as an added distraction and often fails to alert.

The evidence shows that M.D.'s seizure disorder has evolved generally and during the

time he has had Herbie as his service dog. (Dietz, ECF No. 34 at PageID 465, ECF No. 35 at

PageID 544; *see* Exhs. 31, 32.) And the ability to control M.D.'s seizures with medication has

been difficult. (Dietz, ECF No. 34 at PageID 465.) Doctors have taken a trial-and-error

60

approach with his medication.  (*Id.*)  In fact, M.D. has been on six different seizure medicines

within the past two years.  (*Id.*)  Ms. Dietz testified that during the transitions from one

medication to the next, M.D. often has more seizures.  (*Id.*)  And, from the Court's view, this

evolution in M.D.'s seizures also has led to Herbie having to adjust and learn the new ways

M.D.'s seizures present.  Indeed, Ms. Holbert explained that service dogs do not always alert the

same way to every seizure and situation.  (Holbert, ECF No. 34 at PageID 297.)  And, according

to Ms. Holbert, one reason why a service dog may not alert is because its person is having a new

type of seizure.  (*Id.*)

Here Herbie often fails to alert.  (Spiotta, ECF No. 37 at PageID 929; Huffman, ECF No.

37 at PageID 1028.)  And when he does alert, he alerts many ways.  (Spiotta, ECF No. 37 at

PageID 929.)  In the end, Herbie does not consistently alert to seizures at school and so the

irreparable harm factor favors Germantown.  (*Id.*)  When M.D.'s seizures become steadier and

Herbie's alerts become more streamlined and consistent, perhaps the Court could revisit this

question.

## VI.    Balance of Equities

Courts deciding whether to grant a preliminary injunction "must balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the

requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing reference

omitted).  And "[w]hen addressing whether a preliminary injunction would cause substantial

harm to others, the Court may consider potential harm to non-parties and to Defendants."  *S.B. by*

*& through M.B. v. Lee*, 566 F. Supp. 3d 835, 869 (E.D. Tenn. 2021).

The balance of the equities here weigh against Plaintiffs.  Herbie's exclusion does not

harm Plaintiffs.  But the harm to Germantown and other students is substantial.  When Herbie

attended Dogwood, he was disruptive.  He would get the zoomies in the classroom, sniff people, and eat food not meant for him.  (Spiotta, ECF No. 37 at PageID 913–15; Huffman, ECF No. 37 at PageID 993.)  And so allowing Herbie in the classroom places additional responsibilities on school staff.  (*See* Spiotta, ECF No. 37 at PageID 915–16.)  And, likewise, Herbie detracts from Germantown's ability to educate and tend to M.D. and the other students.  (*See id.*)

VII.   **Public Interest**

The final factor courts consider when ruling on a motion for a preliminary injunction is whether that injunction would further the public interest.  *McGirr v. Rehme,* 891 F.3d 603, 610 (6th Cir. 2018).  Of course, the public interest is served by the enforcement of civil rights laws like the antidiscrimination provisions of Section 504 and the ADA.  *See R.K. v. Lee*, 563 F. Supp. 3d 774, 786 (M.D. Tenn. 2021) (citing reference omitted).  But here, Plaintiffs have not shown a likelihood of success on the merits on their ADA and Section 504 claims.  And so this factor does not help Plaintiffs.

<u>**CONCLUSION**</u>

For the above reasons, the Court **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion for a Preliminary and Permanent Injunction (ECF No. 2).  The ruling here is based on evidence about a nine-year-old boy's ability to control his new service dog.  The circumstances may change for the better in the future, which is why the denial here is without prejudice.  But the Court doubts that circumstances will sufficiently change in less than one year from the entry of this Order.

**SO ORDERED**, this 22nd day of April, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE